Dan T. TUCKER et al v. PULASKI FEDERAL
SAVINGS & LOAN Association

5-5841                                    481 S.W. 2d 725

Opinion delivered June 19, 1972

*Cooper Jacoway* and *Christopher C. Mercer, Jr.,* for appellants.

*Edward L. Wright, Jr.,* for appellee.

CARLETON HARRIS, Chief Justice. This litigation concerns the validity of a certain clause contained in a mortgage which provieds, *inter alia,* that the maturity of the indebtedness secured may be accelerated "If the mortgagor sells or conveys (or contracts to sell or convey) all or any part of the Mortgaged Premises without the written consent of the holder of said note". Dan Tucker, a

white resident of Little Rock, purchased in late December of 1965, property located at 2010 West 17th Street in Little Rock. Tucker testified that the property was a three unit apartment, and he lived in one unit and rented two. According to the evidence, at that time, this property was located in an all white neighborhood. The neighborhood gradually became black and Tucker testified that he had trouble keeping renters.[1] A rental agency was able to obtain but one renter, who stayed a few months and moved off, the property remaining vacant for a year. Consideration for the purchase was $25,000, $2,000 being paid down and a note being executed by Tucker and his father for $23,000 with Pulaski Federal Savings and Loan Association, hereinafter called Pulaski. Tucker also executed a mortgage on the purchased property to secure payment. Tucker endeavored to sell his interest in the property and eventually, through a realtor, found purchasers, Mr. and Mrs. Vassie Belcher, a black couple. Pulaski would not approve a transfer to the Belchers, but nontheless, Tucker sold his interest for $1,500 and executed a deed to them subject to the mortgage. Thereafter, on April 14, 1970, Pulaski instituted suit against Tucker and his father and Belcher and wife, wherein the aforementioned clause was set out, Pulaski stating that because of the violation of this provision of the mortgage, the entire unpaid principal balance of the secured note was declared due and payable and it was prayed that the company have judgment in the sum of $20,243.18 with 10% interest, judgment for costs and attorney's fees, foreclosure of the mortgage and sale of the property, possession of the lands, and the extinguishment of the interest of the Belchers in the property. The Tuckers answered, asserting that the acceleration was capricious, oppressive, arbitrary, and an unconscionable restraint on the right of Tucker to freely convey the equity of redemption in the mortgaged property; that said provision was invalid and void. A counterclaim was also filed as a class action on behalf of similarly situated borrowers from Pulaski wherein it was asserted that Pulaski had attempted to assert a regulation by which it would charge the Belchers a sum of $100.00 as a transfer fee; that such

---

[1]Appellants emphasize, and we agree, that there are no racial overtones in this case.

charge is against public policy and was an inequitable effort to interfere with the power of an owner to sell his property freely and for adequate consideration. It was asserted that appellee should be enjoined from levying such charge. Also, as a part of the counterclaim, it was alleged that Pulaski requires a borrower pay to it, as escrow agent, a sum of money each month, in addition to the payments on the note and mortgage, for the purpose of taking care of payments of taxes and insurance premiums; that said monies so paid are trust funds and cannot be used for the profit and personal benefit of the association; that the escrow money is invested with the company which makes a profit from it, but retains the profit for itself, a practice that is in violation of its fiduciary relationaship. The Belchers adopted the answer and counterclaim of the Tuckers and prayed for appropriate relief. On trial, and after the taking of testimony, the court made the following findings which are pertinent to the issues on appeal in this litigation:

"1. The provision in the mortgage set forth in paragraph 7 of the findings of fact above, which gives plaintiff the right to accelerate the payment of the mortgage secured debt upon a sale or transfer of the mortgaged property without plaintiff's consent, is valid, enforceable andi is not against public policy.
2. Plaintiff validly exercised the right to declare the entire mortgage debt to be due and payable at once.
3. Plaintiff has no obligation to justify its refusal to consent to the sale of the mortgaged property to the Belchers.
4. Notwithstanding the absence of any such obligation, plaintiff had valid business reasons for withholding its consent to the sale of the mortgaged property to the Belchers.
5. The Tuckers are indebted to Plaintiff in the sum of $20,327.44 plus interest at the rate of 6% per annum from February 1, 1970, until April 24, 1970, and plus interest at the rate of 10% per annum from April 24, 1970.
6. The Tuckers are also indebted to Plaintiff for an attorney's fee of $2,000.00 and costs.
7. Plaintiff is entitled to foreclosure of its mortgage

and judicial sale of the said lands.

8. The counterclaim of defendants for monetary and injunctive relief as to earnings made by plaintiff on escrow accounts and transfer fees is not a valid class action.

9. The earnings, if any, made by plaintiff on escrow accounts are not payable to defendants either individually or as members of a class."

In accordance with these findings, judgment was rendered and the property ordered sold if said judgment was not paid within 10 days, and the Tuckers were given judgment against the Belchers for any portion of plaintiff's judgment against the Tuckers remaining unpaid after crediting the Pulaski judgment with amounts received from the sale of the property. From the decree so entered the Tuckers and Belchers bring this appeal. For reversal four points are relied upon, viz:

"I

The Chancellor erred in permitting the Savings & Loan Association to accelerate the mortgage debt and to forclose the mortgage, because the acceleration provision is against public policy and void.

II

The escrow funds are held by the Savings & Loan Association as a fiduciary, and the Chancellor erred in permitting the Association to retain for its own the profits realized from investing the fiduciary funds.

III.

The amount of the transfer fee is not related to costs or services performed by the Association, and the Chancellor erred in permitting the Association to charge it.

IV

The Chancellor erred in rejecting the testimony that

the loan closing agent, while acting within the apparent scope of his authority, at the closing of the Association's loan to Dan Tucker assured the Tuckers that the property would stand for the loan."

## I

In passing upon this litigation,[2] we very quickly state that we agree with appellants that appellee cannot, simply on the basis of the quoted clause, accelerate the note, declare the indebtedness due and payable, and foreclose upon the property. This procedure cannot be countenanced in a court of equity. There is no Arkansas decision governing the circumstances at issue, but we have said that equity will grant relief against an attempted acceleration for inequitable conduct. See *Crone* v. *Johnson*, 240 Ark. 1029, 403 S.W. 2d 738. We like the reasoning of the Court of Appeals of Arizona, District 1, Department A, in the case of *Baltimore Life Insurance Company* v. *Hugh L. Harn et al*, 486 P. 2d 190. This case was decided on June 30, 1971, amended July 8, 1971, and rehearing denied September 10, 1971. There, the Harns borrowed money and executed a note and mortgage, the note containing the following provision:

"All sums due and payable under this note and the mortgage or mortgages securing the same, *** shall become due and payable without notice forthwith upon the conveyance of title to all or any portion of the mortgaged premises or property, or the vesting thereof in any other manner in, one other than to Mortgagor named therein.[3]"

The mortgage contained this language:

"This mortgage and all sums hereby secured,*** shall become due and payable at the option of Mort-

---

[2]It might be mentioned that this transaction may well be covered by a provision of the Uniform Commercial Code codified as Ark. Stat. Ann. § 85-1-208 (Add. 1964), but the case was not briefed on that basis by either side.

[3]The note in the case before us has no provision for accelerating the indebtedness because of a sale of the property, but only provides that the holder of the note may declare the unpaid balance due and payable upon a thirty day default in making any payments.

gagee and without notice to Mortgagor forthwith upon the conveyance of Mortgagor's title to all or any portion of said mortgaged property and premises, or upon the vesting of such titles in any manner in persons or entities other than, or with, Mortgagor."

Subsequently the Harns conveyed the mortgaged property to other persons. The appellant asserted that these conveyances were in direct violation of the contractual agreement, and thus gave appellant the right to accelerate and foreclose. The trial court held contrary to this view and on appeal, the appellant urged that the violation of the quoted clause entitled it to acceleration and foreclosure. In holding adversely to appellant, the court said:

"The underlying reason for an acceleration clause of the type before us is to insure that a responsible party is in possession, thus protecting the mortgagee from unanticipated risks.

[3] The acceleration clause in this case is clearly a restraint on the mortgagors' ability to dispose of their property. We believe that so long as an acceleration clause does not purport to restrict absolutely the mortgagor's ability to dispose of their property there is not the type of restraint on alienation that would render the clause void. It follows that the invocation of the clause must be based on grounds that are reasonable on their face.

[4] An action to accelerate and foreclose a mortgage being an equitable proceeding, [citing cases], it is not enough to allege merely that the acceleration clause has been violated. Absent an allegation that the purpose of the clause is in some respect being circumvented or that the mortgagee's security is jeopardized, a plaintiff cannot be entitled to equitable relief. Otherwise the equitable powers of the trial court would be invoked to impose an extreme penalty on a mortgagor with no showing that he has violated the substance of the agreement, that is, that he would not make a conveyance that would impair the security.

*We note that the complaint contained no allegation that there had been default in payments as they became due and at oral argument counsel for the plaintiffs, responding to a question directed to this point, affirmed that there had been no missed payments. At no place in the pleading does an allegation appear that the plaintiff's security is in any way jeopardized.* [our emphasis]"

Of course, we can certainly see why a mortgagee would object to some transfers; a mortgagor, if permitted, could sell his equity in property and transfer the indebtedness to a person who had been convicted of operating a bawdy house, operating a gambling house, or illegally selling whiskey or drugs, and naturally a mortgagee would not desire to accept such a person, realizing that the property could be used by that person for a similar purpose. The same might be true of an individual who persistently had failed to pay his obligations, who was without a job, or who had a record of permitting property to deteriorate.

On the other hand, and this frequently happens, a mortgagor could be transferred from his job to another location and, if persons to whom he desired to sell the property could be arbitrarily disapproved by the loan company, he could be in the position of being forced to sell to someone at great sacrifice.[4] This could well be true even though a loan might be three-fourths paid. The validity of such a requirement would leave a mortgagor much at the mercy of the mortgagee. Accordingly, we are in full agreement with the court that decided the case cited that there must be legitimate grounds for refusal to accept a transfer to a particular individual or concern.

This premise being established, let us examine the facts in the litigation before us to determine whether appellee company had reasonable grounds to reject the Belchers. A pertinent fact is that the record reflects that Vassie Belcher and wife Esther, in the latter part of

[4]Tucker testified that he did not know the questioned provision was in the contract.

1966, purchased a home, financing the purchase through Pulaski, in the amount of $8,211.09. This loan was to be repaid commencing on February 1, 1966, with monthly payments of $65.00 per month for a little over sixteen years. In the testimony at the trial, various officers of the company testified. W. P. Gulley, Jr., President of Pulaski, testified that in disapproving the Belchers for the transfer, the loan committee considered the Belchers' payment record on the already existing loan, and a credit report obtained on the Belchers. It does not appear that he ever positively stated that the Belchers' loan payment record was considered *before* the loan was disapproved. One other officer testified that the Belcher loan was referred to in the meeting of the loan committee. Two other company officers, Guy Maris, III, and Howard E. Boddy, stated that the payment record of the Belchers on the loan was not considered by them prior to the original disapproval, and that the loan had already been turned down before this matter was checked. [4-a] Mr. Boddy stated that he did not even know that the Belchers had a loan with Pulaski at the time of rejection, and Maris stated that the assumption had been rejected before he examined the loan record. Of course, this is not to say that the company was not entitled to consider all information obtained in determining the fitness of the Belchers to assume the loan, but it does somewhat appear that the disapproval may not have been predicated on the payment record by the Belchers. This seems entirely logical since the Belchers had never been delinquent, i.e., they had never been as much as thirty days late in making a monthly payment. The record reflects that the Belchers had paid on their loan for 42 months and that during that period, they had paid before the due date nine months, one month the payment was exactly on the due date, and for 32 months they had paid after the due date, averaging 12 days late (from the due date). The other stated reason for disapproving the Belchers was a credit report. We do not think any consideration should be given to 8 of the items, although all of these were paid (late) except one, which was an automobile repossession. These items all occurred before Pulaski ever approved the original loan to the Belchers, so apparently these late payments could not have caused much concern.

[4-a] This testimony by deposition.

Six items are listed from September 1966 through 1968 including the repossession of an automobile. The record reflects that the other 5 items were paid; however, 2 items were past due before being paid. As to the repossession, Belcher stated that he had great difficulty with the automobile; that it would never perform satisfactorily; that he did not succeed in getting the company to fix it, and he finally turned it back in.

It might be mentioned that the company never did inspect or investigate the occupancy of the Belchers on the property under mortgage, and accordingly could not have known whether the property was being properly taken care of. The record reflects that Belcher is current in his payments to Pulaski on his original loan, payments being $65.00 per month, and undisputedly, he has tendered the sum of $198.41 each month as payments on the property purchased from Tucker, but these payments have not been accepted. Belcher offered during the trial to make all monthly payments due in open court.

Let it be remembered that Dan Tucker is still liable on the note, irrespective of the transfer. Of course, Tucker could leave the state, which would make enforcement more difficult, though there is nothing in the record to indicate that this appellant has any thought of leaving. However, Tucker's father is also liable on the note. There is yet additional security; Tucker purchased the property from two Little Rock residents, Mrs. Dessie Patrick Keck and Mrs. Doris Marie Koon, mother and daughter. In financing the purchase, Tucker applied to Pulaski for a $23,000 loan. Mrs. Keck and Mrs. Koon, as a matter of inducing Pulaski to make the loan, entered into an agreement to put up as additional security (for performance of the obligations assumed by Tucker) a savings account held with Pulaski in the amount of $5,500. The agreement provides for a release of a portion of the $5,500 deposit for each $1,000 reduction of the principal of the loan. Mr. Gulley testified that $1,000 had been released, the company being obligated to release $500 for each $1,000 reduction on the principal. The agreement even provides that, in case of a foreclosure which results in a deficiency, the indemnitors agree that they are indebted to Pulaski

up to the amount of their pledge in taking care of any deficiency judgment. All in all, it would appear that Pulaski is adequately secured.

In filing suit for judgment on the note and foreclosure, Pulaski sets out only one ground, *viz*, that Tucker, without the consent of Pulaski, sold and conveyed the mortgaged lands to the Belchers; that appellee then declared the entire unpaid principal balance due and payable.[5]

We think it would be extremely unfair to hold that the Belchers are a bad risk when they are not only current in the original loan, but have likewise tendered the monthly payments each month on the property purchased from Tucker.

Accordingly, we hold that the chancellor erred, first, in holding that plaintiff had no obligation to justify its refusal to consent to the sale of the mortgaged property to the Belchers, and further erred in holding that Pulaski had valid business reasons for withholding its consent.

## II

We do not agree with appellants on this point. At the outset, it might be stated that filing a class action as a counterclaim seems to be entirely beyond the scope of the counterclaim statute. Ark. Stat. Ann. § 27-1121 (Repl. 1962) Paragraph 3, provides that the defendant's pleadings shall contain, "A statement of any new matter constituting a defense, counterclaim or set-off, in ordinary and concise language, without repetition." This very definitely appears to be a personal statute. There is no evidence in this record that appellee coerces its borrowers to establish escrow accounts; in fact, the Belchers, on their present loan, do not pay any monies into an escrow account. Actually, the escrow account results in a service to the borrower, for it absolves him of the responsibility

---

[5]A copy of a letter for appellees counsel to Tucker is made an exhibit to the complaint, this letter stating that Pulaski declined assumption because of the "extremely bad credit report" and "the extremely bad pay record of Vassie and Esther Belcher on an existing mortgage with our client".

and trouble of paying the taxes and insurance. A mortgagee is entitled to be in a position where he knows the taxes and insurance will be paid, for otherwise, his security would be very much in jeopardy. Of course, taking care of these items requires quite a bit of time of the clerical employees. The record also reflects that in loans guaranteed by the Federal Housing Authority or the Veteran's Administration, there is a requirement that an escrow account must be maintained for those loans which exceed 80% of the value of the appraised property. All in all, we are unable to see any merit in this contention.

## III

Here again, this contention was advanced by a counterclaim for the benefit of a class, and what was said in Point II relative to this phase, is equally applicable here. Pulaski charges a transfer fee of $100.00. Of course, Belchers have never paid a transfer fee because they were not approved for the transfer, although they did tender the $100.00. Since the Belchers are prevailing in this litigation, the question will undoubtedly legitimately arise. There was testimony that one other building and loan company in Pulaski County charges $100.00, and testimony that one bank charges $50.00. There was no evidence as to charges made by other building and loan associations, or other lending institutions. This is all the proof in the record. While Mr. Gulley detailed to some extent the work involved in making the transfer, there is nothing in the record which reflects the relationship between the work involved and the amount charged; in other words, there is no "time analysis".[6] As stated, the question is not, because of the nature of the pleading involved, before us at this time.

---

[6]From Gulley's testimony: "I have explained, I think, earlier in some detail the procedure we go through as far as investigating the person's credit and I believe I alluded to the calls that generally a loan officer must handle that comes in to us incident to a conveyance of property. This has continued to increase, plus we make I believe something like 25 to 30 clerical changes in operations such as changing the heading on the ledger sheet, changing our computer cards over, getting them a new mailing card, changing the fire insurance policy, changing a tax payment card. We maintain an insurance expiration card file. The policy must not only be changed, the insurance expiration card must be changed. There is quite often a change in insurance."

## IV

Troy Tucker, father of Dan Tucker, who also signed the note, testified that he went to the Beach Abstract & Guaranty Company, the closing agent, and asked questions of the loan closing officer. Testimony was offered that the officer told the Tuckers that the property would stand for itself and there would be no deficiency judgment in case of foreclosure. The court refused to accept this testimony, and we think correctly so since there was no evidence to show that the officer of Beach Abstract had any authority to do anything other than to close the loan. Certainly, Beach Abstract had no authority, real or apparent, to bind Pulaski by oral statements in contradiction of the written instruments.

In accordance with what has been said, the decree as to Point I is reversed (including findings one through seven) and we hold that Pulaski Federal Savings & Loan Association was not justified in refusing consent to the sale of the mortgaged property from the Tuckers to the Belchers, and accordingly must accept the transfer; as to the other three points, the decree is affirmed, and the cause is remanded to the Pulaski County Chancery Court (Second Division) for the entry of a decree not inconsistent with this opinion.

It is so ordered.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. I would affirm the decree of the chancery court in every respect. I agree with all of the majority opinion except the treatment of the factual situation with reference to the acceleration in this case. The chancellor made specific findings that appellee validly exercised the right to declare the entire mortgage debt due and payable and that it had valid business reasons for withholding its consent to the sale of the mortgaged property to the Belchers. While I agree with appellants that they had the burden of showing that appellee's refusal to accept the Belchers as purchasers

was unreasonable, capricious and inequitable, I submit that they failed to meet this burden. I also agree that they stated the proper test rather than the majority's retrospective determination of reasonableness. I believe, however, that the UCC rule stated in Ark. Stat. Ann. § 85-1-208 (Add. 1961) was intended to and does govern. Whether it does or not, or however the test may be stated, that section is a clear, concise statement of the test that should be applied. In other words, the courts should direct their inquiry toward a determination whether the option to accelerate was exercised in the good faith belief that the prospect of payment or performance was impaired and the burden of establishing lack of good faith on the party against whom the power has been exercised.

Appellants' argument addressed to this point consist mainly of these assertions in their brief: that the association paid no attention to the security involved, to the care given other property by the Belchers or to their income; that foreclosure was brought as punishment to the seller and the purchasers and as an object lesson to others because Tucker sold to the Belchers with the association's approval, that the association has not established objective standards for granting or withholding its consent, which can be ascertained by a mortgagor; that appellee's fears are remote; that the Belchers' payment record was not bad; that the association's record at the time the application for transfer was made was incomplete, because it did not reflect the divorce of Vassie Belcher from his former wife, his remarriage or the present financial stability of the Belchers, both of whom are employed.

I submit that the evidence does not lend any support to some of these assertations, and that it does not clearly preponderate against the chancellor's finding in any event. I further submit that many of these assertions are not appropriate to the subject under inquiry. I shall direct my attention only to the question that is most pertinent, in view of the majority opinion, i.e., were the chancellor's findings as to the validity of appellee's exercise of its right to accelerate and the validity of appellee's withholding its consent to the sale clearly against the preponderance of the evidence?

In reviewing the evidence, equity requires that, while looking over the shoulder of the officers of appellee, we try to gain their perspective, not as the caretakers of their own money, but as guardians of the savings of many people, some of whom are widows and orphans. The responsibilities of these officers are great and they are called upon to exercise their best judgment gained from many years of experience in the lending of other people's money in a manner that will insure the best possible return to appellee's investors. It is also imperative that we remember that Tucker's right to sell his property to whomever he chose, at his own risk, is not questioned here. The only question is whether appellee is required to accept any purchaser he chose as its primary obligor, and, as appellants put it, whether in its refusal to consent and the resulting acceleration, appellee acted capriciously or whimsically.

First, I should like to note that the record is totally devoid of any evidence that appellee's officers acted punitively. Only one seeking to reach that result could find any inference from the testimony on which to base such a finding. Even if such a strained inference could be drawn there is certainly no preponderance of evidence to support such a finding, and there is even a greater certainty that the chancellor's contrary findings are not clearly against the preponderance of the evidence. In reviewing the evidence it must be remembered that two separate occasions for the exercise of judgment and discretion by appellee's officers arose. The first was whether to consent to the transfer. The second was whether to accelerate. In order to evaluate the matter from the point of view of a sincere, conscientious officer of a savings and loan association, a review of the background pertaining to this loan at the time of the first decision is imperative.

The property, a three-unit apartment at 2010 West 17th Street in Little Rock, was sold to Tucker on December 22, 1965, by Mrs. Patricia Keck and her daughter Mrs. Doris Marie Koon for $25,000. The appraisal for a loan by appellee indicated a property value of $23,500 to $24,000. Appellee usually restricted its loans to 70% or 75% of appraised value. It was unwilling to make a

loan with the property as the only security, and with the 24-year-old Dan Tucker, unmarried, as the only person liable on the note. The loan of $23,000 was made on December 22, 1965, the date of the conveyance to the borrower, after Troy Tucker, father of Dan Tucker, signed the note as a comaker, and the sellers pledged $5,500, which was in the form of a savings account with appellee, as additional security, or indemnity, to induce appellee to make the loan. It seems obvious to me that this was a marginal loan from the very beginning.

Tucker testified that: When he bought the property, it was in an "all white" neighborhood; he lived in one apartment and rented the others for a rental adequate to pay the loan installments and enable him to live "rent-free"; the neighborhood gradually changed to "colored" and the difficulty in obtaining and keeping renters eventually resulted in the property remaining vacant for a full year; efforts of a real estate agent to sell the property were unsuccessful for several months, after which a real estate agent found the Belchers, who made the only offer Tucker received; he sold his equity to them for $1,500, even though he had thought it to be worth $4,000 to $5,000.

The indemnity deposit by Tucker's grantors had shrunk to $4,500, pursuant to the agreement which permitted the indemnitors to withdraw $500 for each $1000 paid on the loan principal. At the time the application was made for appellee's approval of the transfer, only $2,000 of the principal had been paid. Thus, because of the trend, Tucker received only $1,500 for his $2,000 cash payment and his $2,000 loan principal payment. This meant that the value of the security to appellee had already diminished by $3,500, i.e., $2,500 reduction in property value and $1,000 reduction of the indemnity. The property, on the basis of this sale had a value of only $21,000 to $21,500, and the loan became virtually 100% of the property value.

The association officers had observed serious problems in connection with some of their loans. At the time of the decisions made in this case, they were having an

average of 10 transfers per month. They had found, however, that the rate of delinquency on assumed loans was alarmingly high, posing a problem which was becoming progressively more serious, and causing appellee's concern about it to intensify. This rate reached the point where it was approximately 50% higher than those on which the title remained in the original borrower. Little Rock savings and loan associations have historically been among the most liberal in permitting transfers of property on which they have mortgages. As the money market has become more competitive, these associations have attempted to analyze their businesses more carefully. While appellee formerly had no requirements relating to transfers, and made no investigation of purchasers, as the delinquency rate on assumed loans increased, its officers began to give attention to its approach to the matter. The cost of servicing delinquent accounts is a significant cause for concern, and makes such a loan expensive to the lender, because a great deal of time must be devoted by someone in bringing such accounts up to date, and appellee has found that the process must usually be repeated again and again.

Around July 1, 1969, appellee started procedures to give more attention to property sales where an existing loan was to be assumed. Since that time appellee has investigated all purchasers in such cases. Appellee adopted a policy of separately evaluating each case involving a loan assumption and accepting as purchasers those who were satisfactory credit risks. The examination of applications to transfer was made by a loan committee, on which several officers of the association served. Among the members of the committee were W. P. Gulley, president and chief executive officer for 11 years and previously assistant secretary, vice president and director, John D. Greenway, head of the loan department, who is now executive vice president and previously a vice president for more than eight years, Howard Boddy, an assistant vice president, who is now a branch manager, but was a loan officer at all times pertinent to this controversy, and who had been employed by the association for 7 1/2 years, Guy Maris III, a five-year employee who was an assistant vice president and loan officer in 1969 and 1970,

and was in charge of delinquent accounts. A Mr. Giddings and Mr. Byrd, who are not further identified, are also members of this committee. No minutes were kept of these meetings and attendance was not recorded. The approval of at least four of the members was required before a loan could be made.

The procedure required an application by the proposed purchaser. The applicant was required to meet with a loan officer and give personal information and references and information as to the transaction. In addition to past personal credit performance, the association considers the applicant's income in relation to the cost of the house, the amount of the monthly payments to be assumed, estimated cost of utilities and maintenance, the proposed occupancy and the applicant's manner of occupancy and maintenance, the relationship of applicant's living expenses to his income, the length of time employed in his current job, the amount and type of applicant's income, and, to a lesser extent, the applicant's net worth. The major items are past credit performance and stability of earnings. After the application is made, the loan officer to whom it is made obtains a credit report from the Retail Credit Bureau, which usually reports by telephone. Since the inauguration of these procedures, the association has only withheld approval of one proposed purchaser other than the Belchers, but the seller in that case withdrew from the transaction. This is the first case in which the sale was carried out without the consent of the association.

The Belchers made their application containing a financial statement and other personal information to Howard Boddy on December 3, 1969, who promptly obtained a credit report. It is clear that the loan committee decided to reject the application upon the basis of Belcher's past credit performance, and never reached other factors it might have weighed had it found this one satisfactory. Discrepancies in the testimony of the officers as to whether Belcher's past record with the association was considered along with the credit report, and as to the identity of the loan committee members acting are attributable largely to the fact that Boddy apparently arrived at a de-

cision as soon as he saw the credit report and the fact that actually two decisions were made, i.e., whether to approve the transfer, and whether to accelerate. It is clear that the decision not to approve the transfer was unanimous among the members who participated, regardless of the makeup of the group.

Boddy took the application, loan file and credit report to the loan committee meeting. He said that no final action was taken at the first meeting and that the ultimate decision was eventually left to him, Greenway and Gulley, all of whom agreed that the Belchers should not be approved because the credit report was unsatisfactory under the association standards. Boddy said that the association occasionally overlooked such things as an account 30 days overdue or a $5 or $10 collection, if everything else appeared favorable. His recollection was that, in the case of Belcher, there were numerous bad items—probably 10 or more. He was the first to raise the question whether the transfer should be approved. He did not recall having any knowledge of Belcher's performance on the previous loan at the time of the disapproval of the assumption of the loan by Belcher, and his decision was not based on anything except the credit report.

Greenway stated that the association made no record of all of the members of the loan committee passing on an application, but did keep a record as to two of them. Greenway felt that the committee did refer to Belcher's previous payment record on a loan made to him by the association and that the rejection was based upon this and the credit report, but admitted that the loan record might possibly have been brought to his attention on the following day. He said that the credit report reflected 15 unfavorable items, seven of which were turned over to another agency for collection, two of which were repossessions, two of which appeared to have been paid after being turned over to someone for collection and two of which were paid after becoming delinquent. Greenway said that the committee's action was actually a recommendation and that the final decision was up to Gulley.

Gulley reached his decision upon the basis of the

credit report and the previously unsatisfactory account of Belcher with the association. He classified as "bad items" any charge account or balance that had been referred to an attorney or collection agency for collection, any suit to collect a debt, or any delinquent payment on an existing debt. He testified that appellee's officers had learned from bitter experience that when one has been delinquent in the past, he is frequently delinquent in the future. Gulley said that these decisions were actually made by the loan committee, and in this case by Greenway, and reported to him for his concurrence or confirmation. Gulley said he considered the record on Belcher's existing loan, or one that had been assumed by him. According to Gulley, the loan assumption by Belcher was disapproved on January 12, 1970, or within a day or two thereafter. The names recorded on the disapproval of the assumption were those of Greenway and Boddy. Gulley considered several items on the credit report unsatisfactory, among which were items on which two and three payments, respectively, were past due, and a repossession. He said that small items, when numerous, were not to be ignored as indicative of attitude toward prompt payment.

After the transfer was disapproved, Mr. Belcher and his attorney presented Tucker's deed to Belcher, dated February 18, 1970, to Guy Maris III, who informed them that the transfer had been disapproved. Maris was familiar with Belcher's past record on a loan by appellee because of activities in collecting delinquent payments. He was unable to recall whether he had communicated that information to other members of the loan committee before the deed was presented to him. Because of this record and the past credit record, Maris concurred in the subsequent decision to accelerate the debt. He apparently did not consider the Belcher loan payment record in determining his fitness to assume the loan.

Maris and Gulley stated the particulars relating to Belcher's delinquencies on the previous loan. Maris thought he first called Belcher about a delinquency in 1966. Accounts were turned over to him as delinquent after non-payment for either 15 or 30 days, depending upon the

persistency of the delinquency. Gulley testified that the previous Belcher loan had been on the association's books for 42 months, during which monthly payments were made on or before the due date on only 10 occasions, but payments averaged 12 days later overall and late payments averaged 15 days late. A check for a payment was returned twice in September 1969. He said that at the end of the year the association had to pay the taxes on the property. Maris found records of 27 "first and second" notices of delinquency to the Belchers. He found five instances where payments were more than 30 days late. The association considered this experience unsatisfactory, but did not feel that foreclosure was warranted, even though it considered a loan in default when a payment was more than 30 days overdue.

There is no doubt that this record was known to those who participated in the decision to accelerate. This was the first such decision the association had been called upon to make after adoption of its new procedures, as this was the first time a transfer had been made without association consent. This decision must have been arrived at after deliberation, as several weeks intervened between the date the deed was presented to Maris and the institution of foreclosure. Maris advised Gulley, with whom the final decision rested, of the deed. Gulley testified that he acted upon the recommendation of Greenway and Boddy, the information supplied by the Belchers and that disclosed by association records. Greenway says that he recommended acceleration. Gulley did not act, however, until he discussed the matter with Greenway, with Katherine Williamson, and Mackey Faulkner, treasurer and assistant treasurer of the association, and with directors Edward L. Wright, Joseph B. Hurst and Joshua Shepherd. Gulley stated that a marginal borrower's account is expensive to handle, even if there is never a foreclosure.

The association was confronted with a decision whether to accept a 58-year-old man with a questionable credit record and an unsatisfactory performance on a previous loan as primary obligor on a loan that was always marginal and promises to continue to be. Further, while

Belcher held two jobs, he had been recently unemployed, had held his principal employment only 11 months, and had been divorced and remarried. While such a person might be carried as a borrower without foreclosure on one small loan, it is easy to see why he might not be an acceptable risk on two. There was evidence that the association followed FHA guidelines that payments should not exceed 20% of the borrower's monthly income, and the price of a dwelling should not exceed 2 1/2 times the borrower's annual income. There was also testimony that FHA and VA prohibit future loans when one person would have in effect more than one assumed loan at a time.

Clearly, the decision arrived at was not arbitrary, capricious or whimsical. It is not for us or any judicial tribunal to pass on the business judgment of those whose experience gives them insight into such matters, so long as there are factors that require a choice between alternatives which are dependent upon the exercise of that judgment and there are *any* reasons that would support the choice made. This was clearly recognized by the chancellor, and I do not see how it is possible to say that the evidence clearly preponderated against his findings.

It is no answer to say that the Tuckers are still liable and that there is no evidence that either anticipates leaving the state. In the first place, the current mobility of our society and the high percentage of our population who do change residences every year are matters of common knowledge that every businessman should take into account. Despite present intentions, collection from the Tuckers could become a serious problem during the life of the loan in spite of any lack of bad faith on their part. In the next place, it may well be questionable that either Belcher or the elder Tucker will survive the loan.

I think the decree should be affirmed as not against the preponderance of the evidence because I do not think that the collective judgment of this court should supersede that of the association officers.