Mary Ann ABREGO *v.* UNITED PEOPLES FEDERAL SAVINGS AND LOAN ASSOCIATION, et al

83-251                                                      664 S.W.2d 858

Supreme Court of Arkansas
Opinion delivered February 6, 1984
[Rehearing denied March 12, 1984.*]

*Hickman and Hays, JJ., would grant rehearing.

310

*Harper, Young, Smith & Maurras,* by: *Robert Y. Cohen, II,* for appellant.

*Warner & Smith,* by: *G. Alan Wooten* and *Joel D. Johnson,* for appellee United Peoples Federal Savings & Loan Association.

*Gregory T. Karber,* for appellees Warner Holdings, Ltd. and Ruth Singer and Hymie Singer.

*Phillip Jack Taylor,* for appellees Larry A. Cotten and Brenda S. Cotten.

ROBERT H. DUDLEY, Justice. In 1976 the Federal Home Loan Bank Board adopted a regulation which preempted state law governing due-on-sale clauses in mortgages. The primary issue before us is whether the doctrine of pre-emption is applicable to a mortgage executed prior to the 1976 regulation. We hold that the doctrine is not applicable and reverse the trial court. Collateral issues affecting property rights are raised and, for clarity, the opinion is developed by numbered segments. The Court of Appeals certified the case to this Court since it involves significant legal principles of major importance. Rule 29(4)(b).

I

On April 28, 1974, Gilbert and Mary Ann Abrego purchased two four-plex apartment buildings in Fort Smith for $162,000. The next day, April 29, 1974, in order to pay for their purchase, they borrowed $148,000 from the corporate

predecessor of appellee, United Peoples Federal Savings and Loan Association; a federally chartered association. They executed an installment note bearing interest at the rate of 9% per annum and being payable in monthly installments of $1,242.10 for a period of 25 years. To secure the debt they executed a mortgage providing for acceleration of the maturity of the debt if ". . . the mortgagor or assignee sells or conveys (or contracts to sell or convey) all or any part of the mortgaged property without the written consent of the holder of said note."

On May 3, 1979, Gilbert Abrego died and his estate is not a party to this appeal.

On January 23, 1981, Mary Ann Abrego violated the due-on-sale clause by contracting to sell the apartment building to Larry and Brenda Cotten. The consideration from the Cottens was $155,000 with $26,000 being paid on the day of sale and the remainder to be paid on monthly installments equal to the installment payments due United Peoples. Mary Ann Abrego executed a warranty deed conveying title to the Cottens and placed it in escrow with instructions that it was to be delivered to the Cottens upon payment in full. The sales contract contained a clause by which the Cottens agreed to hold Mary Ann Abrego "harmless from any liability or loss occasioned by the demand of United Peoples." United Peoples was not notified of the sale and the Cottens took possession of the buildings.

Larry Cotten, a building contractor, spent $10,000 repairing the heating and air conditioning systems, fixing electrical problems, performing landscaping work, painting the exterior of both buildings and the interior of seven of the eight apartments. On March 17, 1981, United Peoples learned of the sales contract and subsequently requested that the Cottens either renegotiate the rate of interest to a higher rate or else immediately pay the full amount of debt.

On October 16, 1981, the Cottens sold all of their equity and interest in the property to Warner Holdings, Ltd., and Ruth Singer. The consideration was $20,000 in cash, a $22,000 promissory note and the assumption of all indebt-

edness owed by the Cottens to Mary Ann Abrego. Hymie Singer, the husband of Ruth Singer, endorsed the note. The contract provides that Warner and Ruth Singer agree to pay "all costs incurred by the Vendors [Cottens] in protecting their interest herein, including a reasonable attorney's fee and other costs."

Notice of acceleration and demand for immediate payment were subsequently given by United Peoples. Fourteen months after the sale to the Cottens, and with none of the installment payments being in default, United Peoples filed this suit asking for acceleration of the date of maturity of the debt evidenced by the note, for judgment on that note, and for foreclosure of the mortgage securing the debt. The original complaint averred that the ground for acceleration was violation of the due-on-sale clause. An amended complaint additionally alleged jeopardy of the security. The chancellor ordered acceleration of the date of maturity as a result of violating the due-on-sale clause and also because the security was in jeopardy. In addition, the indemnity clauses were held to indemnify Mary Ann Abrego and the Cottens for 80% of their expenses.

## II

In 1972 we held that the violation of a due-on-sale clause was not sufficient, by itself, to accelerate the maturity date of the entire debt. The additional requirement of proving a legitimate security ground for refusal to accept the transfer of title was placed upon the creditor. *Tucker* v. *Pulaski Federal Savings & Loan Assn.*, 252 Ark. 849, 481 S.W.2d 725 (1972). As a result of *Tucker*, the property owner held an assumable loan. It constituted a valuable right. As interest rates rose on new mortgages after 1972 a property seller could increase the selling price of his property to reflect the value of his low rate assumable loan. The *Tucker* decision became a settled legal principle governing the ownership and devolution of property; it became a rule of property. See *Gibson* v. *Talley*, 206 Ark. 1, 174 S.W.2d 551 (1943). The note and mortgage executed by Mary Ann Abrego on April 28, 1974, was subject to the *Tucker* rule of

property and, as a matter of law, gave her a vested right in a loan which could be assumed by a third person so long as there was no legitimate jeopardy of security ground for the creditor to refuse to accept the title.

On July 31, 1976, after Mary Ann Abrego had already acquired her assumable loan, the Federal Home Loan Bank Board issued a regulation which required that due-on-sale clauses in mortgages to federally chartered savings and loan associations be governed exclusively by federal law. 12 C.F.R. § 545.8-3(f). The Supreme Court of the United States held that the regulation was a valid preemption of state law. *Fidelity Federal Savings & Loan Association* v. *de la Cuesta,* 458 U.S. 141 (1982). In 1983 we acknowledged the federal preemption and reversed part of *Tucker,* stating: "[I]t is clear that our rule in *Tucker* can no longer apply to federal savings and loan associations in Arkansas." *Independence Federal Savings & Loan Ass'n* v. *Davis,* 278 Ark. 387, 646 S.W.2d 336 (1983); see also case note *Fidelity Federal Savings & Loan Ass'n* v. *de la Cuesta:* A Federal Regulation's Preemptive Effect on State Due on Sale Law, 36 Ark. L.Rev. 705 (1983).

United Peoples tacitly acknowledges that the 1974 mortgage is subject to our *Tucker* property rules unless the preemption doctrine is applied as of the date of the mortgage. United Peoples' first argument is that the Federal Home Loan Bank Board first preempted the field in 1948. See 12 C.F.R. § 545.8-3(a) and *Schott* v. *Mission Federal Savings & Loan Ass'n,* No. CIV-75-366 at 13-15 (CD Cal. July 30, 1975). The argument is without merit. The 1948 regulation does not expressly preempt the application of state laws governing due-on-sale clauses. It provides that due-on-sale clauses must be contained in the loan instrument along with provisions for failure to pay taxes, make assessments and repairs. The requirement that each association use a particular form of mortgage constitutes an internal operating directive to the individual federally insured associations. It is not a clear and manifest requirement for the application of the preemption doctrine. See *Ray* v. *Atlantic Richfield Co.,* 435 U.S. 151 (1978). Likewise, the *Tucker* decision did not create such a conflict with the

1948 regulation that compliance with both was impossible. See *Florida Lime and Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132 (1963).

We find no express or implied preemption in the 1948 regulation. Similar cases finding no preemption as a result of the 1948 regulation are: *Holiday Acres No. 3* v. *Midwest Federal, Etc.*, 308 N.W.2d 471 (Minn. 1981); *Scappaticci* v. *Southwest Savings & Loan Ass'n*, 135 Ariz. 456, 662 P.2d 131 (1983); and *Orange Federal Savings & Loan Ass'n* v. *Dykes*, 433 So.2d 642 (Fla. App. 5 Dist. 1983).

United Peoples alternatively argues that the board's regulation effective July 31, 1976 should be given retroactive application. Preliminary to examining the language of the regulation, we note that the Supreme Court of the United States in *de la Cuesta, supra,* manifested concern for property rights vested under state law and expressly did not decide the issue of retroactive application of the preemption doctrine as a result of the 1976 regulation. See Footnote 24. An examination of the regulation reveals that it contains no specific language making it retroactive and it contains no language expressing an intent to impair previously vested rights. As a general principle regulations and statutes operate prospectively only. The United States Supreme Court recently opined:

> The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student. *Compare* Sands, Sutherland's Statutory Construction § 106 *with Linkletter* v. *Walker*, 381 U.S. 618, 622-625 (1965). This Court has often pointed out that
>
>> the first rule of construction is that legislation must be considered as addressed to the future, not to the past. . . . The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."

*Union Pacific R. Co.* v. *Laramie Stock Yards Co.,* 231 U.S. 190, 199 (1913) (citations omitted). See, *e.g., United States Fidelity & Guaranty Co.* v. *Struthers Wells Co.,* 209 U.S. 306, 314 (1980) ("The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other."); *United States* v. *The Peggy,* 5 U.S. (1 Cranch) 103, 110 (1801).

*United States* v. *Security Industrial Bank, et al.* 103 S.Ct. 407 (1982).

In the absence of any express language requiring retroactive application of the regulation, and because of the vested property rights under state law, the regulation does not operate retroactively. We find no cases to the contrary. United Peoples cites *Bailey* v. *First Federal Savings & Loan Ass'n of Ottawa,* 467 F. Supp. 1139 (1979) as contra authority. We do not so interpret the case. There, the federal district judge held that the issue met the requirements for federal jurisdiction.

The mortgage in the case at bar, executed in 1974, is subject to the *Tucker, supra,* rule of property and the subsequent federal preemption of July 31, 1976 is not retroactively applicable. The ruling of the trial court is reversed on this issue.

### III

The complaint did not allege, nor was there proof of, failure to pay any installment when due. In fact, United Peoples refused to accept payments after the suit was filed and the owners made the payments into the registry of the court. There was no allegation or proof of failure to pay insurance premiums or cancellation of policy. Similarly, there was no pleading of a failure to pay taxes and the proof was clear that, at the time of attempted acceleration, the taxes were not in default. By the time of trial they were in default but appellee Hymie Singer testified he did not know they were in default and that he would imediately pay them.

Mary Ann Abrego remained liable on the original note. United Peoples was familiar with the $500,000 net worth and credit reliability of the Cottens. In fact, United Peoples made a substantial loan to the Cottens only three days before the trial. The Cottens improved the security. Hymie Singer testified that Warner Holdings held 60 parcels of land in the United States alone, and that he had purchased approximately two million dollars worth of property in Fort Smith in the past two years. Harry Lieber, the executive vice-president of United Peoples, admitted that the primary reason for filing the lawsuit was for United Peoples to obtain a higher interest rate. The findings of fact by the Chancellor that United Peoples reasonably believed their security interest was in jeopardy is without support in the record and is reversed.

## IV

In *Bowen* v. *Danna,* 276 Ark. 528, 637 S.W.2d 560 (1982), we found that the good faith requirement for acceleration, found in Ark. Stat. Ann. § 85-1-208 (Add. 1961), does not apply to clauses which permit the acceleration of a debt upon the default of a specific condition which is in the exclusive control of the debtor. See case note *Bowen* v. *Danna: Application of Uniform Commercial Code Section 1-208 to Acceleration Clauses in Real Property Transfers,* 36 Ark. L.Rev. 643 (1983). In that case we sought to make clear the remedies available to a creditor and the protections available to a debtor. We stated that if the acceleration clause provides that the creditor can accelerate "at will" or "when he deems himself insecure" or words to that effect, the creditor is in exclusive control of the act which triggers acceleration and there must be some protection for the debtor. As a result, we held the good faith requirement is applicable to clauses which place exclusive control in the creditor. However, should the acceleration clause provide for default upon occurrence of an event exclusively within the control of the debtor, such as the failure to maintain insurance coverage, then the creditor cannot bring about the occurrence of that specific event and there is no need for the protection by the good faith requirement of § 85-1-208.

The sale by the debtor in the case at bar was the occurrence of an event exclusively within the control of the debtor and, yet, the creditor is subject to the requirements of § 85-1-208. The reason for this exception is that *Tucker, supra,* has become a rule of property. This rule of property exists for all due-on-sale clauses except those in favor of savings and loan associations which were executed on or after July 31, 1976. The preemption of state law applies to state chartered savings and loan associations. *Schulte* v. *Benton Savings & Loan Ass'n,* 279 Ark. 275, 651 S.W.2d 71 (1983).

## V

A rule of property is rarely, if ever, overturned, so that the bar can rely on the rule in drafting long term instruments and advising clients. *Gibson* v. *Talley,* 206 Ark. 1, 174 S.W.2d 551 (1943). However, a long term reliance upon our *Tucker* rule may constitute a misplaced trust. Congress has enacted a new federal preemption statute which eliminates restrictions on enforcement of due-on-sale clause in real property loans. See Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. § 1701 J-3. The drafters of the act recognized that in states, like Arkansas, where enforcement of due-on-sale clauses has been restricted by court decision, real estate transactions have occurred in reliance upon a rule of property. Accordingly, the legislation creates an exception for loans which were made or assumed after the highest appellate court of a state rendered a decision, like *Tucker,* which restricted the exercise of due-on-sale clauses, but which were made on or assumed before the effective date of the legislation, October 15, 1982. Loans made between these periods will remain subject to state law for three years, or until October 15, 1985. The loans which fall into this category are termed "window period" loans because they fall into the "window" between the time of the state decision and the time that the Garn-St. Germain Act closed the "window" by making all due-on-sale clauses enforceable. See Grier, *Due-on-Sale Clauses Under the Garn-St. Germain Depository Institutions Act of 1982,* 17 Univ. of San Francisco Law Review 355 at 372 (1983), and see *Scappaticci* v. *Southwest Savings, supra,* which discusses the Arizona case which

served as the foundation for our *Tucker* decision. Ultimately our rule of property may be eliminated by a complete federal preemption of the *Tucker* decision.

## VI

The Cottens contracted to indemnify Mary Ann Abrego for "any liability or loss occasioned by the demands of United Peoples Federal Savings and Loan Association and will bear any and all expenses in connection therewith." Similarly, Warner Holdings and Singer agreed to indemnify the Cottens for "all costs incurred by the Vendors [Cottens] in protesting their interest therein, including a reasonable attorney's fee and other costs." The language in both agreements is clear, yet the trial court awarded indemnification of only 80% of the attorneys' fees and expenses incurred by the parties. An award of only 80% of expenses and fees appears to be arbitrary, but it is possible the trial judge thought the amount of the attorneys' fees was unreasonable. We remand this part of the case for the trial court to award attorneys' fees and other costs which were reasonable, proper, necessary and incurred in good faith and with due diligence. See *Love* v. *United States Fidelity and Guaranty Co.*, 263 Ark. 925, 568 S.W.2d 746 (1978). We find no merit in the indemnitors' arguments that they should not be liable under their agreements.

Reversed and remanded.

Hickman and Hays, JJ., dissent.

Darrell Hickman, Justice, dissenting. The majority has overruled a finding by the chancellor without reciting all of the evidence that would support the court's finding. Instead, the evidence is presented in a light most favorable to the appellants, which is contrary to our decisions. See *Taylor* v. *Terry*, 279 Ark. 97, 649 S.W.2d 392 (1983). We can overrule a finding if it is clearly erroneous. ARCP 52. In this case the chancellor found:

Plaintiff (United Peoples Federal Savings and Loan Association) in good faith believed that the conveyance

impairs its security for the note of the defendant Abrego held by it and that its security is in jeopardy as a result of the sale of this property without Plaintiff's consent and/or assumption of the note by the Defendant purchasers.

In 1974 Mrs. Abrego and her husband purchased this property, which consisted of an apartment complex, and financed it with a loan held by United Peoples. Her husband died in 1979. The property became a financial burden, was losing money, and she did not have the experience to maintain it. So, in January, 1981, she sold it to Larry and Brenda Cotten under a contract of sale. Neither party notified United Peoples that it had been sold. The Cottens would pay Mrs. Abrego, and she would make payments to United Peoples. In October, 1981, United Peoples discovered the sale through its insurance department and notified Mrs. Abrego that the loan should be paid off or assumed.

Mr. Cotten then talked to the officials of United Peoples about the assumption, but an agreement was never reached. There was testimony that the Cottens never formally requested permission to assume the loan. There seems to be no doubt that the Cottens were well-known to United Peoples and could have qualified for a loan. The Cottens sold the property on October 16, 1981, to Warner Holdings, Ltd., and Ruth Siger on a contract of sale. It seems Hymie Singer was the real buyer through Warner and his wife. Again the association was not notified. Both the contract of sale to the Cottens and Singer recognized that the association could call the loan due and payable in full, and both contracts provided full reimbursement to the party that might have to meet that demand. In other words, the Cottens agreed to reimburse Mrs. Abrego, and Warner and Mrs. Singer made the same agreement with the Cottens. The contract between Mrs. Abrego and the Cottens provided "that in the event United Peoples Federal Savings and Loan Association of Fort Smith, Arkansas, makes demand on the seller for payment in full of its first mortgage, the buyers shall have the option of paying such mortgage in full or entering into a modification agreement with said Savings

and Loan Association . . . that the buyers shall hold the seller harmless from any liability or loss occasioned by the demands of the [association] and will bear any and all expenses in connection therewith." Singer agreed with the Cottens that "[a]ll parties acknowledge the possibility that the first mortgage holder may declare its loan immediately due and payable or attempt to do so and the Vendees are willing to indemnify and hold the Vendors harmless from any loss arising therefrom. In the event of default in the payment of the aforesaid indebtedness as well as the $22,000.00 obligation still remaining due from the Vendees to the Vendors, the Vendees, jointly and severally, agree to pay all costs incurred by the Vendors in protecting their interest herein, including a reasonable attorney's fee and other costs."

In the latter part of 1981, Hymie Singer went to the association and talked to them about the loan. The vice president in charge testified that he did not actually know whether the borrower was to be the Cottens or Singer and he did not know anything about Hymie Singer. Evidently, Mr. Singer submitted to the association some documents on his and Warner Holdings' financial condition. According to the association official, they were outdated, unsigned and unaudited, and none of the assets or liabilities of Singer could be verified. The official testified this was rental property and the association needed to know the reputation and capabilities of the manager. Mr. Singer testified he got angry after talking to the officials about a new loan and left. He said he agreed to pay 14½ percent interest plus $300 or $400 for the documents. He said he thought the information he supplied on his finances was adequate, but he conceded the information was not certified. He testified that he gave the officials the name of his bank in Canada. There was testimony that neither the Cottens nor Mr. Singer made a complete application to assume the loan.

This suit was filed in March 1983. The chancellor found that United Peoples acted in good faith in deeming its security in jeopardy, and I cannot say that finding was clearly erroneous. We still do not know from this record Mr. Singer's financial condition. The majority emphasizes

several times that *Tucker* v. *Pulaski Federal Savings and Loan Assn.*, 252 Ark. 849, 481 S.W.2d 725 (1972), has become a rule of property, and it abrogates the right of United Peoples to accelerate this loan. Even if it is a "rule of property," *Tucker* does not require reversal of this case. There the savings and loan refused to approve a loan application of the buyer. The court held "there must be legitimate grounds for refusal to accept a transfer to a particular individual or concern." *Tucker* did not hold that an institution could not renegotiate the interest and secure one more fair for the lending institution; it did not hold that when parties buy property knowing a lending agency may well accelerate payment, the agency can be prevented from doing so. I would not be so quick to hold that *Tucker* has become a rule of property and certainly not the rule the majority finds it to be. *Tucker* says a good deal more than the majority indicates. First of all, it was a case of unique facts. Frankly, the majority in *Tucker* felt that the lending agency had refused to approve a loan application from a buyer because of race. In this case, neither of the secretive buyers completed a loan application. In *Tucker,* the court left open considerations other than security for refusing to approve a new loan or assumption. The reputation one has for managing property can be a consideration. The lending agency in this case offered testimony that it did not know Mr. Singer and had no way to certify his large holdings. Singer conceded that he did not provide certified statements.

Perhaps more important, neither of the secretive buyers in this case is completely innocent. They wanted to keep the existing mortgage, which was beneficial to them, but knew the lending agency might call the loan in. To their credit, they agreed unequivocally to bear any costs if that was done. They were going to hold out for the best deal they could. This is not a case of a lending agency being arbitrary. In fact, Mrs. Abrego has no real complaint. She has recourse against Cotten, and Cotten has recourse against Singer. Singer said that if he could not keep the loan, he would pay it off. He should be given that opportunity.

What we have is a situation converse to *Tucker*. Here, there were surreptitious sales to prevent the lender from

seeking a better return on its money. The reasons in *Tucker* for holding the clause invalid were because it could be used to defeat the right of one to sell property. In this case that is hardly in question since the property has been sold twice.

In *Independence Federal Savings and Loan Assn.* v. *Davis*, 278 Ark. 387, 646 S.W.2d 336 (1983), we held that *Tucker* was preempted by federal legislation — in other words, overruled. I assume the loan in that case was made after the federal legislation was in effect, although our decision does not say so. I doubt seriously that *Tucker* granted vested rights that cannot be superseded by this federal legislation.

I do not agree with the majority's characterization of the case of *Fidelity Federal Sav. & Loan Assn.* v. *de la Cuesta*, 458 U.S. 141 (1982). Actually, the majority is basing its decision on a footnote to the decision. But the decision itself is very strong evidence that it was the intention of congress to preempt state law in this field. The Court stated:

> The preamble unequivocally expresses the Board's determination to displace state law:
>
> > 'Finally, it was and is the Board's intent to have . . . due-on-sale practices of Federal associations governed *exclusively* by Federal law. Therefore, . . . exercise of due-on-sale clauses by Federal associations shall be governed and controlled *solely* by [§ 545.8-3] and the Board's new Statement of Policy. *Federal associations shall not be bound by or subject to any conflicting State law which imposes different . . . due-on-sale requirements,* nor shall Federal associations attempt to . . . avoid the limitations on the exercise of due-on-sale clauses delineated in [§ 545.8-3(g)] on the ground that such . . . avoidance of limitations is permissible under state law.' 41 Fed. Reg. 18286, 18287 (1976).
>
> In addition, the Board recently has 'confirm[ed]' that the due-on-sale practices of federal savings and loans 'shall be governed exclusively by the Board's

regulations in preemption of and without regard to any limitations imposed by state law on either their inclusion or exercise.' 12 CFR § 556.9(f)(2)(1982). Thus, we conclude that the Board's due-on-sale regulation was meant to pre-empt conflicting state limitations on the due-on-sale practices of federal savings and loans, and that the California Supreme Court's decision in *Wellenkamp* creates such a conflict.

The court essentially held that any state law that stood in the way of federal regulations had to yield.

To prevent the acceleration in this case denies United Peoples the right to receive a higher rate of interest. The federal regulation was adopted to permit federal associations to adjust their loan portfolios, and our decision denies them that right. Mrs. Abrego has been deprived of no right in this case.

HAYS, J., joins in this dissent.