HOLIDAY ACRES NO. 3, a
partnership, Respondent,

v.

MIDWEST FEDERAL SAVINGS AND
LOAN ASSOCIATION OF MINNE-
APOLIS, Appellant.

No. 50637.

Supreme Court of Minnesota.

April 3, 1981.

Rehearing Denied Aug. 5, 1981.

472

Jonathan K. Heffron, Washington, D.C., for Federal Home Loan Bank Bd.

Faegre & Benson, James A. Dueholm and James G. Ray, Minneapolis, for Savings League of Minnesota.

Robins, Davis & Lyons, James R. Safely and Leslie H. Novak, Minneapolis, for Minnesota Ass'n of Realtors.

WAHL, Justice.

Midwest Federal Savings and Loan Association of Minneapolis (hereinafter Midwest Federal) appeals from a declaratory judgment[1] of the Dakota County District Court which declares the due-on-sale clause contained in the mortgage agreement between Midwest Federal and respondent Holiday Acres No. 3 (hereinafter Holiday Acres) null and void as an unlawful restraint upon the alienation of property and restrains the exercise by Midwest Federal of any rights under the due-on-sale clause. This judgment was entered after we had reversed a previous dismissal for want of justiciable controversy and remanded the case for thorough consideration. *Holiday Acres No. 3 v. Midwest Federal Savings & Loan Association*, 271 N.W.2d 445 (Minn.1978). The case raises important questions with regard to the validity of the due-on-sale clause in a mortgage to which a federally chartered savings and loan association is a party. We reverse.

Appellant Midwest Federal is a federally chartered savings and loan association. Respondent Holiday Acres is a partnership formed for investment purposes. On April 30, 1969, appellant and respondent entered into a mortgage agreement to finance respondent's purchase of an apartment complex in West St. Paul, Minnesota. The mortgage contains a standard acceleration-of-payment clause, commonly referred to as a due-on-sale clause, which provides as follows:

Hessian, McKasy & Soderberg, Thomas E. Harms and John A. Knapp, Minneapolis, for appellant.

Holmes & Graven, David L. Graven and Larry M. Wertheim, Minneapolis, for respondent.

1. The declaratory judgment is pursuant to the Uniform Declaratory Judgments Act, Minn. Stat. ch. 555 (1978).

In the event that the mortgagors convey the title (legal, equitable or both) to all or any portion of said premises or in the event that such title becomes vested in a person other than the mortgagors in any manner whatsoever except under the power of eminent domain, that in any such case the entire unpaid principal of the note secured hereby with all accrued interest thereon shall, at the option of the mortgagee at any time thereafter, become immediately due and payable without notice.

On January 26, 1976, respondent entered into an earnest money contract to sell the property to a third-party purchaser. The contract provided that either party could terminate if mortgagee Midwest Federal did not agree to waive its rights under the due-on-sale clause. Appellant Midwest Federal was advised of the terms of the prospective conveyance. Appellant advised respondent that it did not agree to waive the due-on-sale clause and would require the prospective purchaser to refinance at a higher interest rate, with the unpaid balance of the loan callable after 10 years. The purchaser found this unacceptable and terminated the purchase agreement on April 15, 1976. Holiday Acres then sought the declaratory judgment and equitable relief which the trial court granted on remand.[2]

The controversy over the validity of due-on-sale clauses, which has been litigated in many state and federal courts, has now reached this court. We must first decide, however, whether the Federal Home Loan Bank Board regulations or other federal law preempt the operation of state law with regard to the exercise of that clause by a federal savings and loan association.

### I.

The Supremacy Clause of the United States Constitution declares:

This Constitution, and the laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.

U.S.Const. art. VI, § 2. But the powers of the United States are limited in our federal form of government. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S.Const. amend. X.

Professor David Currie has said, with respect to the preemption of state law by federal:

It seems mandatory to begin with Hart and Wechsler's famous insight, *The Federal Courts and the Federal System* 470–71 (2d ed. 1973):

Federal law is generally interstitial in its nature. It rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states .... It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. Congress acts, in short, against the background of the total *corpus juris* of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation. That this is so was partially affirmed in § 34 of the First Judiciary Act, now 28 U.S.C. § 1652 [state laws as rules of decision] ....

State law that contradicts federal, obviously, is outlawed by the Supremacy Clause. Where there is a contradiction is often not so obvious * * *. Although the Court has not always said so, it seems proper to say that the question in such cases is the familiar choice-of-law problem of accommodating conflicting gov-

---

**2.** On September 14, 1979, seven days after the district court's order declaring the due-on-sale clause null and void, respondent sold the subject property to a different third-party purchas-er. The conveyance was by contract for deed, under the terms of which respondent remains responsible to appellant for the remaining mortgage payments.

ernmental interests: Does the purpose of the federal law require subordination of state policy?

\* \* \* \* \* \*

Somewhat less obvious in principle, but resting basically upon the same process of construction in the light of state and federal policies, are decisions holding that federal laws preclude application of state laws with parallel rather than contrary effect.

\* \* \* \* \* \*

[T]he issues demands consideration of the state interest served by the contested law and the degree to which its effectuation would infringe federal policy.

D. Currie, *Federal Courts* 886–88 (2d ed. 1975).

■ The Eighth Circuit Court of Appeals has suggested a general framework for analysis of whether federal law preempts state law: (1) Does the federal government possess the power to regulate in a given area? (2) If so, is compliance with federal law and state law a physical impossibility? (3) If not, did Congress unequivocally and expressly declare that the authority conferred by it should be exclusive? (4) Even if not, has Congress impliedly preempted state control? Key factors to be considered here include the intent of Congress, the pervasiveness of the regulatory scheme, whether the nature of the subject matter "demands 'exclusive federal regulation in order to achieve uniformity vital to national interests,'" and whether state law would "stand as an obstacle" to the realization of such national policy. *Northern States Power Co. v. Minnesota,* 447 F.2d 1143, 1146–47 (8th Cir. 1971), *aff'd mem.* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972).

This court, applying the *Northern States Power* framework, found that federal regulation of flammable fabrics which specifically preempted inconsistent state laws did not preempt the state's imposition of punitive damages on a defendant who had complied with minimum federal standards. *Gryc v. Dayton-Hudson Corp.,* 297 N.W.2d 727 (Minn.), *cert. denied,* —— U.S. ——, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980).

■ We will find federal preemption in a field of traditional state interest only when legislative intent and delegation of authority are clear. Home loan mortgages, and the inclusion of due-on-sale clauses in those mortgages, are matters of traditional state interest and concern.[3] The Minnesota legislature has in fact established state policy in this area.[4] The United States Supreme Court is reluctant to deem that state

---

**3.** Recent legislative activity supports the statements that mortgage laws are a traditional area of concern for the states. Congress enacted a provision making state laws concerning interest and other finance charges inapplicable to certain loans secured by residential real property. Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L.No.96–221, § 501(a)(1), 94 Stat. 161. Congress left room for states explicitly to opt out of the federal preemption, *id.,* § 501(b)(2), and Minnesota *did so immediately.* Act of April 23, 1980, ch. 599, § 4, 1980 Minn.Laws 1127, codified at Minn.Stat. § 47.203.

**4.** If the purpose of a conventional loan is to enable a borrower to purchase a one to four family dwelling for his or her primary residence, the lender shall consent to the subsequent transfer of the real estate if the existing borrower continues after transfer to be obligated for repayment of the entire remaining indebtedness. The lender shall release the existing borrower from all obligations under the loan instruments, if the transferee (1) meets the standards of credit worthiness normally used by persons in the business of making conventional loans, including but not limited to the ability of the transferee to make the loan payments and satisfactorily maintain the real estate used as collateral, and (2) executes an agreement in writing with the lender whereby the transferee assumes the obligations of the existing borrower under the loan instruments. Any such agreement shall not affect the priority, validity or enforceability of any loan instrument. A lender may charge a fee not in excess of one-tenth of one percent of the remaining unpaid principal balance in the event the loan or advance of credit is assumed by the transferee and the existing borrower continues after the transfer to be obligated for repayment of the entire assumed indebtedness. A lender may charge a fee not in excess of one percent of the remaining unpaid principal balance in the event the remaining indebtedness is assumed by the transferee and the existing borrower is released from all obligations under the loan instruments.

Minn.Stat. § 47.20, subd. 6 (1980).

regulatory power is preempted by federal regulation of an area of commerce "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). That court will not find the "historic police powers" of a state to be superseded by a federal act "unless that was the clear and manifest purpose of Congress." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

We recognize that "Congress can act so unequivocally as to make clear that it intends no regulation except its own." *Rice, id.* at 236, 67 S.Ct. at 1155. There is no challenge here to the power of Congress to regulate due-on-sale clauses, but we find no express and unequivocal exercise of that power in the relevant acts of Congress.

In 1932, Congress passed the Federal Home Loan Bank Act (hereinafter Bank Act), 12 U.S.C. §§ 1421–1449 (1976). The Bank Act established a Federal Home Loan Bank Board (hereinafter Bank Board) which is to supervise the Federal Home Loan Banks, carry out the duties specifically prescribed in the Bank Act, and "adopt, amend, and require the observance of such rules, regulations, and orders as shall be necessary from time to time for carrying out the purposes of the provisions of this chapter." *Id.* § 1437(a). The Bank Board is an independent agency in the executive branch of the federal government. *Id.* § 1437(b). All obligations issued by a Federal Home Loan Bank are exempted from taxation by the United States government. *Id.* § 1433. Moreover, claims or defenses by associations based on state usury laws are specifically preempted with respect to certain obligations. *Id.* § 1425b(e) (Supp. III 1979).

The Bank Board is authorized to examine the laws of various states "relating to the conveying or recording of land titles, * * *

or to the enforcement of the rights of holders of mortgages on land securing loans, or otherwise." *Id.* § 1428 (1976). If the Bank Board determines that state law is inadequate to protect the advances made by a Federal Home Loan Bank to a member or nonmember borrower, it may limit or withhold operations in that state until conditions become satisfactory. *Id.* Yet Congress did not, in the Bank Act, specifically preempt the issue of the validity of the due-on-sale clauses in such mortgages.

In 1933, Congress passed the Home Owners' Loan Act (hereinafter HOLA), 12 U.S.C. §§ 1461–1468 (1976), authorizing the establishment of Federal Savings and Loan Associations. HOLA provides:

> In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as "Federal Savings and Loan Associations" * * * and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.

12 U.S.C. § 1464(a) (Supp. III 1979).

HOLA, as amended, specifically provides that federal savings and loan associations formerly organized as state savings and loan associations are not exempt from any more-stringent state law pertaining to neighborhood discrimination or to requirements imposed by the Consumer Credit Protection Act. *Id.* Federally chartered savings and loan associations are not exempt from state taxation as long as that taxation is no greater "than that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions." *Id.* § 1464(h) (1976). Despite the specificity with which the above issues were addressed, no mention of due-on-sale clauses is made.

The Bank Board has promulgated extensive regulations, contained in the Code of

Federal Regulations, Title 12, Chapter V, of which Subchapter C (parts 541 through 556) pertains to the Federal Savings and Loan System. The due-on-sale clause issue is not specifically preempted by the regulations as, for example, is the area of fair lending requirements: "Notwithstanding any state law to the contrary, Federal associations are governed solely by the fair lending provisions of \* \* \* the rules and regulations of the Federal Home Loan Bank System and other Federal laws and regulations." 12 C.F.R. § 545.6a (1980).

The Bank Board first specifically mentioned due-on-sale clauses in a regulation which took effect July 31, 1976, as follows:

An association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent.

12 C.F.R. § 545.8–3(f) (1980). The regulation further provides that "exercise by the association of such option \* \* \* shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the association and borrower shall be fixed and governed by that contract." *Id.* We note that the rights of the parties under the contract will be interpreted by state contract and property law.

We reject appellant's argument that state regulation of the exercise of due-on-sale clauses was preempted prior to 1976 by a 1948 regulation which states, "Loan instruments shall \* \* \* provide for full protection to the Federal association." 12 C.F.R. § 545.8–3(a). This language, in the context of the regulation cited, refers to insurance, taxes, assessments, repairs, and other factors enumerated in that section.

■ We conclude that neither Congress nor the Bank Board has expressly preempted the operation of state law with respect to due-on-sale clauses contained in mortgages executed by federally chartered savings and loan associations. A more difficult question is whether there exists implied preemption.

■ Appellant argues that the existence of Bank Board regulations which sometimes prohibit[5] and otherwise provide guidelines for the discretionary waiver[6] of

---

**5.** *Limitations on the exercise of due-on-sale clauses.* With respect to any loan made after July 31, 1976, on the security of a home occupied or to be occupied by the borrower, a Federal association: (1) Shall not exercise a due-on-sale clause because of (i) *creation of a lien or other encumbrance subordinate to the association's security instrument, (ii) creation of a purchase money security interest for household appliances; (iii) transfer by the devise, descent, or operation of law on the death of a joint tenant; or (iv) granting of a leasehold interest of three years or less not containing an option to purchase; (2) shall not impose a prepayment charge or equivalent fee for acceleration of the loan by exercise of a due-on-sale clause; and (3) waives its option to exercise a due-on-sale clause as to a specific transfer [under specified circumstances].
12 C.F.R. § 545.8–3(g) (1980).

**6.** *Imposition of late charges and due-on-sale clauses.*
(a) The Board expects Federal associations to adopt procedures sufficient to ensure that, by the time of loan closing, the rights and obligations of the contracting parties regarding imposition of late charges and prepayment charges and exercise of acceleration clauses (including due-on-sale clauses) are fully and specifically disclosed to the borrower.

(b)(1) Although § 545.8–3(g) of this subchapter *prohibits imposition* of a prepayment charge upon exercise of a due-on-sale clause only with respect to loans on borrower-occupied homes made after July 31, 1976, the Board looks with disfavor on the practice respecting all such loans and believes associations should, except in extraordinary circumstances, abstain from the practice in connection with such loans made before that date.
\*    \*    \*    \*    \*    \*
(c) The Board believes there may be (in addition to the circumstances prescribed in § 545.8–3(g) in which exercise of a due-on-sale clause is prohibited) situations in which it will be *appropriate for* a Federal association to waive its contractual right to accelerate a loan. Those situations include transfer of title to members of the borrower's immedi-

the exercise of due-on-sale clauses is evidence of federal occupation of the field. While we find these regulations to be some evidence of federal occupation, we do not find that the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152. The fact that the federal government may preempt by occupation the field of the internal affairs of federal savings and loan associations[7] does not mean that there is preemption in the field of non-internal affairs such as the validity of contractual provisions contained in mortgages between loan associations and mortgagors.

■ We accept the general principle that state law may not interfere with the internal affairs of federal savings and loan associations. *In re Schott v. Mission Federal Savings & Loan Association*, No. Civ.–75–366 WMB (C.D.Cal. July 30, 1975). Nonetheless, there is no doubt that some state laws effecting federal savings and loan associations are valid, e. g., building codes and zoning regulations. We are not persuaded that state law concerning the exercise of due-on-sale clauses in any way touches upon the regulation or operation of the internal affairs of federal savings and loan associations.

A different result is not mandated by *Conference of Federal Savings & Loan Associations v. Stein*, 604 F.2d 1256 (9th Cir. 1979), *aff'd mem.*, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980), holding that a state may not regulate a federal savings and loan association. In *Conference*, a California anti-redlining statute provided that the state "shall monitor and investigate the lending patterns and practices of financial institutions for compliance." *Id.* at 1259. The *Conference* court expressly noted that it was "not faced with a suit by a borrower against a federal association charging a violation of a substantive state regulation." *Id.* at 1260. It was the regulatory authority of the State of California over the federal savings and loan association that was in dispute. In the case at bar we are asked to apply, not a regulatory provision, but the substantive law of the state.

■ The Bank Board's 1976 regulation, "A Federal association continues to have the power to include [a due-on-sale clause]," 12 C.F.R. § 545.6–11(f) (1979) (amended to delete the word "Federal" and recodified at § 545.8–3(f) (1980)), has been found to be a valid exercise of the Bank Board's power under the Congressional mandate, in 12 U.S.C. § 1464(a), to give "primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States." *Bailey v. First Federal Savings & Loan Association*, 467 F.Supp. 1139, 1141 (C.D.Ill.1979), *appeal docketed*, 636 F.2d 1221 (7th Cir. 1980). If the 1976 regulation is read to preempt state law, it is arguable that the Bank Board "has exceeded the scope of its statutory authority by enacting regulations which deprive borrowers of their state law protections * * *." Note, *Due-on-Sale Clauses and Restraints on Alienation: Does Wellenkamp Apply to Federal Institutions?* 11 Pac.L.J. 1085, 1105 (1980). We read the regulations, however, as authorizing the mere inclusion by federal savings and loan associations of such clauses in their contracts. The regulation does

---

ate family, including a former spouse in connection with a divorce, who occupy or will occupy the property (to the extent not covered by § 545.8–3(g)). Associations also should consider waiving, in cases of extreme hardship to the existing borrower, any right to require an increase in interest rate under a due-on-sale clause.

(d) Even though a Federal association may increase the interest rate as a condition of loan assumption, the Board expects that no association will request such an increase to a rate exceeding the then prevailing rate on comparable new loans made by the association applying its normal lending standards. 12 C.F.R. § 556.9 (1980) (promulgated 1979) (emphasis added).

7. *Murphy v. Colonial Fed. Sav. & Loan Ass'n*, 388 F.2d 609, 612 (2d Cir. 1967); *Rettig v. Arlington Heights Fed. Sav. & Loan Ass'n*, 405 F.Supp. 819 (N.D.Ill.1975); *Springfield Institution for Sav. v. Worcester Fed. Sav. & Loan Ass'n*, 329 Mass. 184, 107 N.E.2d 315, *cert. denied*, 344 U.S. 884, 73 S.Ct. 184, 97 L.Ed. 684 (1952).

not mandate the inclusion of the clause nor, *a fortiori*, does it mandate exercise of such clauses. *Glendale Federal Savings & Loan Association v. Fox*, 459 F.Supp. 903 (C.D. Calif.1978) (granting motion for partial summary judgment), *judgment entered*, 481 F.Supp. 616 (1979), finding California law on the validity and exercisability of due-on-sale clauses "inapplicable to Glendale Federal's loan instruments executed on or after [the date of the Board's regulation]," 459 F.Supp. at 912, arose in a context in which the state would have prevented Glendale Federal from serving as a take-out lender on a construction project unless Glendale Federal's notes and deed of trust forms were revised.[8] Here, state law requires no revision of notes or forms, nor does it attempt to regulate the inclusion of the clause in loan instruments or to regulate any other aspect of the internal operations of federal savings and loan associations.

▋ The need for national uniformity of loan practices is asserted as justifying preemption. If this national interest were indeed an important policy, it seems that the inclusion of such clauses would be mandated rather than permitted. Mere federal permission does not necessarily preclude state prohibition. *See Kake Village v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) (federal permit for use of salmon traps held no bar to application of state anti-trap law). With regard to whether application of state law as to validity or exercisability of due-on-sale clauses would interfere with the operation of the federal enactment or impair the attainment of federal goals, we can only say, with the Supreme Court of Oregon, "we do not believe that preemption occurs simply because under some imaginable set of economic facts the application of state law could impede the efficient execution of a federal statutory purpose." *Derenco, Inc. v. Benjamin Franklin Federal Savings & Loan Association*, 281 Or. 533, 541, 577 P.2d 477, 483,

*cert. denied*, 439 U.S. 1051, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978).

The Florida Court of Appeals has found that a due-on-sale clause does not have to be automatically enforced by a state court without regard to that state's traditional principles of equity. *First Federal Savings & Loan Association v. Lockwood*, 385 So.2d 156, 160 (Fla.App.1980). In a case involving state court enforcement of a due-on-sale clause where a federal savings and loan institution brought a mortgage foreclosure action in state court based on the violation of the clause, the court held that the federal savings and loan association had no right to foreclose its mortgage absent any allegation or proof of impairment of security. *Id.*

▋ Property law, including the interpretation of mortgages, is traditionally an area of concern for the states. *Kirkland v. Fidelity Federal Savings & Loan Association*, No. 79–859–Civ–J–B (M.D.Fla. May 16, 1980). As the *Kirkland* court noted, "most mortgage foreclosures are appropriately brought in state courts, and even when brought in federal court generally are governed by state law. *See Federal National Mortgage Association v. Kostrunek*, 228 F.Supp. 777 (S.D.Iowa 1964) (methods of foreclosure and rights of redemption governed by Iowa law)." Slip op. at 3.

▋ The Bank Act and HOLA were passed during the depression with the laudable purpose of helping homeowners who faced serious difficulties with a mortgage. Certain laws of some states were preempted because they were a hindrance to the federal design dictated by the dire circumstances. Yet it would be unreasonable, and ironic, to hold now that the Congress intended those acts to justify the removal of homeowners' protections under state law. It is unlikely that our holding that litigation in a state court concerning the exercise of a due-on-sale clause will be subject to state law will frustrate any overriding federal

---

8. The action was brought against California state officials for declaratory and injunctive relief. State law required that Fox, California's Real Estate Commissioner, examine proposed real estate subdivision developments. In con-nection with this examination, proposed lenders were required to submit sample copies of security instruments. Glendale Federal was notified that its instruments would not be acceptable because of their due-on-sale clauses.

objective. The state in no way attempts to regulate the operation of the lending facility. We find no federal preemption and see no reason sufficient to compel the granting to a federally chartered savings and loan association seeking judgment in a court of this state a status not enjoyed by a savings and loan association chartered by the state.[9]

### II.

▮▮▮ Midwest Federal argues that material factual issues remain unresolved which made improper the granting of summary judgment. A district court may grant summary judgment if the pleadings and other documents before the court "show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn.R. Civ.P. 56.03 (1980).

▮▮▮ We do not find that there is any actual dispute over the facts but rather that the parties seem concerned with the meaning or the legal consequences of the facts. Where no factual disputes are raised, the resolution of which might clarify the application of law, summary judgment is proper. *Republic National Life Insurance Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 356 (Minn.1979).

### III.

▮▮▮ A due-on-sale clause [10] is a mortgage payment acceleration clause which requires the borrower to obtain the consent of the lender prior to the disposition of the borrower's interest and which permits the lender, by exercising its option to deny consent, to declare the entire balance due and owing.[11] Respondent urges this court to invalidate the exercise of a due-on-sale clause as a restraint on the alienation of property.

The due-on-sale clause was created and, until recent years, used to provide the lender with the opportunity to evaluate the potential purchaser and security much as it would any prospective borrower.[12] If the potential purchaser or the security represented a lending risk which normally would not be undertaken, the acceleration clause gave the lender the bargaining tool to seek additional interest or security commensurate with the risk, or, in the alternative, the ability to free itself from the transaction by declaring the entire balance due.

Due-on-sale clauses historically, e. g., 55 Am.Jur.2d *Mortgages* § 371 (1971), and today, e. g., *Wellenkamp v. Bank of America*, 21 Cal.3d 943, 582 P.2d 970, 148 Cal.Rptr. 379 (1978), have been recognized as a valid stipulation to protect the lender's security interest. But to allow a lender to use the

**9.** *Kaski v. First Fed. Sav. & Loan Ass'n*, 72 Wis.2d 132, 240 N.W.2d 367 (1974), in finding federal preemption, assumed that a federally chartered savings and loan association "is, by law, an instrumentality of the United States * * *." *Id.* at 136, 240 N.W.2d at 370. This may not be true in the ordinary sense of the word, *i. e.*, "a means or agency," Webster's New World Dictionary 731 (2d college ed. 1972). This court has expressly found that a federally chartered savings and loan association is not an instrumentality of the United States within the meaning of exemption from state sales and use taxes. "It is wholly private in character; it is not a part of the Federal government and performs no substantial Federal function." *Midwest Fed. Sav. & Loan Ass'n v. Comm'r*, 259 N.W.2d 596, 598 (Minn.1977).

**10.** A due-on-sale clause is also known as a due-on-transfer clause, although a due-on-transfer clause may allow the lender to accelerate where a disposition other than a sale has been made, e. g., a bequest or gift. A due-on-

encumbrance clause operates in the same manner as a due-on-sale clause, except that encumbrance as well as sale will trigger the right of the lender to accelerate. Any generic due-on clause may include numerous actions which trigger the lender's right to accelerate.

**11.** Bonanno, *Due on Sale and Prepayment Clauses in Real Estate Financing in California in Times of Fluctuating Interest Rates—Legal Issues and Alternatives*, 6 U.S.F.L.Rev. 267, 271 (1972). Note *Judicial Treatment of the Due-on-Sale Clause: The Case for Adopting Standards of Reasonableness and Unconscionability*, 27 Stan.L.Rev. 1109, 1110 (1975).

**12.** Bonanno, *supra* note 11; Subcommittee on "Due-on" Clauses of the Committee on Real Estate Financing, *Enforcement of Due-on-Transfer Clauses*, 13 Real Prop., Prob. & Tr.J. 891, 894–97 (1978) (hereinafter Subcommittee Report).

due-on-sale clause to increase the interest rate upon transfer may amount to rewriting the contract. Since the due-on-sale clause was historically used to protect the lender's security interest, it is reasonable to assume that the parties bargained for the clause to be valid only when transfer threatened the lender's security interest. *See, e. g., Silver v. Rochester Savings Bank*, 73 A.D.2d 81, 424 N.Y.S.2d 945 (1980) (a due-on-sale clause could not be used to increase interest rates where the lender did not indicate that its consent to transfer might be withheld for that purpose).

As interest rates began to rise in the mid-1960's, the due-on-sale clause became a vehicle, particularly in residential financing, to ensure the lender's position in the money market. The lender, faced with increasing costs of securing funds for new loans and the need to maintain reserves to back existing loans, began to use the due-on-sale clause to guarantee that its money was lent at existing rates. The due-on-sale clause provided the lender with the leverage to negotiate a higher rate of interest or, in the alternative, the ability to declare the entire balance due and owing, thereby obtaining the funds to lend at existing interest rates. The ability of the lender to obtain a higher rate of interest by threatening to accelerate necessarily works to the borrower-seller's disadvantage.

If the borrower-seller were able to transfer a comparatively low interest rate mortgage, the borrower-seller, by varying the selling price, could increase either the number of potential buyers or the profit realized from the sale.[13] If the lender can demand a higher rate of interest through the use of the due-on-sale clause, the borrower-seller may be forced either to lower his asking price in order to accommodate the buyer or to forgo the sale.[14]

The situation faced in the instant case is one in which the due-on-sale clause was no doubt originally inserted for the purpose of reducing non-market risks by ensuring that the security would not be impaired, but subsequently, with changed conditions, was used to protect against a market risk such as wide fluctuation of interest rates.

The effects of the exercise of the due-on-sale clause on the assumption of mortgages by those buying mortgaged property, while not precisely clear, seem to us somewhat predictable. A prospective buyer will look at a piece of real estate, with its bundle of rights we know as property, and, in a commercial investment context, determine its net present value. Then: (1) If the mortgagor can provide low-interest financing, the secondary buyer will be willing to offer a higher purchase price, which can be applied to the mortgagor's next purchase. (2) If, on the other hand, the mortgagee can force refinancing at current market rates, the real estate purchase price will have to be marked down to the point at which the net present value, taking into account higher finance charges, meets the secondary buyer's original offer, and the mortgagee will collect more money either to distribute as profits or to make available to borrowers.

If we lived in a world in which transaction costs, e. g., costs of negotiation, settlement, litigation, were zero, perhaps there would be no substantive change in the position of the parties, regardless of how the court ruled, because the parties could henceforth adjust their positions to accommodate the rule. *See, e. g.,* R. Posner, *Economic Analysis of Law* 68–69 (2d ed. 1977). But transaction costs are real and often substantial. A *per se* rule on the validity and exercisability of the due-on-sale clause is likely to benefit materially either lenders or primary borrowers as a class, to the detriment of the other, by shifting these costs.

The allocation of the potential profit or loss generated by the existence of a low-interest loan in a high-interest mortgage

13. Bartke and Tagaropulos, *Michigan's Looking Glass World of Due-on-Sale Clauses*, 24 Wayne L.Rev. 971, 981 (1978).

14. *E. g.,* Bonanno, *supra* note 11, at 284–85.

market forms the basis of this dispute.[15] There is sharp disagreement among the various commentators and courts concerning the judiciary's role in interfering with a contractual provision and concerning the economic impact of a decision allowing or forbidding the use of due-on-sale clauses to increase interest rates. One writer notes:

> To label the loss of a purported favorable economic position as a restraint on alienation is a misconception of that doctrine, which was not intended to provide profitability of alienation, but only the ability to alienate without penalty. The loss of an advantage premised upon voiding of a contract can hardly be considered a penalty.

Subcommittee Report, *supra* note 11, at 926.

Yet the results of unrestricted exercise of the due-on-sale clause may be harsh on the consumer. The dissent in *Crockett v. First Federal Savings & Loan Association*, 289 N.C. 620, 224 S.E.2d 580 (1976), summarizes the concerns expressed for the borrower who is financing a personal residence:

> Consider the case of the typical young couple buying a home. Their purpose is not investment for profit but acquisition of a residence. They borrow substantially all of the purchase price because they cannot pay cash for the property. Substantially all of their own funds become tied up in the property. After a time the husband's employer transfers him to another city, or a better employment opportunity in another city presents itself. When it moves the family must acquire a new residence. As before, they do not have the ability to do so unless they can get their money out of their present residence by a sale of it. It is a matter of common experience that most of their prospective buyers are in a comparable financial condition so that they cannot purchase the house, for its fair value, unless they can assume the existing mortgage or refinance it. If the prospective purchaser has to refinance the house, the

cost of such financing must, as a practical matter, come, in whole or in part, out of the price he is otherwise willing to pay the seller. To permit the mortgagee to charge the prospective purchaser a higher rate of interest, or a substantial fixed sum, for the privilege of carrying on the existing mortgage is, in effect, a penalty upon the seller for it must inevitably reduce what he will receive from the sale of his house.

> In such a situation it is completely unrealistic to say that the homeowner and the money lender were on equal footing in making the original contract and equally unrealistic to say that the homeowner can avoid the loss resulting from the threat to accelerate the due date of his note by paying off the mortgage or by refraining from selling his home. He has to sell and he cannot pay off the mortgage. This use of the acceleration clause to coerce an increase in the rate of interest is oppressive, extortionate and unconscionable.

> Consider, again, the homeowner who loses his job, suffers disabling illness or some like financial disaster. He borrows and mortgages his property through necessity, not in order to speculate. It is utterly unrealistic to say he has equal bargaining ability with the money lender. If finally he must sell his home because his financial storm continues to rage, is it not unreasonable and oppressive to permit the money lender further to drive his net sale price down by threatening to foreclose unless the prospective purchaser will agree to pay a higher rate of interest? * * *.

*Id.* at 642–43, 224 S.E.2d at 594–95 (Lake, J., dissenting). *See also* Note, *supra* note 10, at 1111–13.

Numerous jurisdictions have found the exercise of a due-on-sale clause to be a restraint on alienation unless it is exercised reasonably, meaning that the clause is exercised to protect the lender's security inter-

---

**15.** No doubt the use of short-term or variable-rate mortgages would reduce this premium differential by bringing the long- and short-term interest rates closer together and by reducing the market risk inherent in obligating oneself to a long-term, fixed-rate contract.

est rather than its position in the money market.[16] A leading case articulates the restraint rational as follows:

The availability of new financing often depends upon general economic conditions. In times of inflation, when money is "tight" and funds available for real estate loans are in short supply, new financing may be difficult, if not impossible to obtain. The same result may occur when interest rates and the transactional costs of obtaining new financing are high, making it economically unfeasible for the buyer to acquire a new loan. When economic conditions are such that new financing is either unavailable or economically unfeasible, the seller and buyer will normally agree to a form of financing arrangement wherein the buyer will assume the seller's loan. In such circumstances, if the lender is unwilling to permit assumption of the existing loan, and instead elects to enforce the due-on clause, transfer of the property may be prohibited entirely, because the buyer will be unable to substitute a new loan for the loan being called due, and the seller will not receive an amount from the buyer sufficient to discharge that loan, particularly when the balance due is substantial. (See 1 Miller & Starr, Current Law of Cal. Real Estate, pt. 1 (1975 ed.) § 3 435–436.) Even when the lender is willing to waive its option to accelerate in return for the assumption of the existing loan at an increased interest rate, an inhibitory effect on transfer may still result. The buyer, faced with the lender's demand for increased interest, may insist that the seller lower the purchase price. The seller would then be forced to choose between lowering the purchase price and absorbing the loss with the resulting reduction in his equity interest, or refusing to go through with the sale at all. In either event, the result in terms of a restraint on alienation is clear.

*Wellenkamp*, 21 Cal.3d at 950–51, 582 P.2d at 974–75, 148 Cal.Rptr. at 383–84 (footnotes and citations omitted).

Nonetheless, the classification of the due-on-sale clause as a restraint on alienation has been strongly criticized. *E.g., Occidental Savings & Loan Association v. Venco Partnership*, 206 Neb. 469, 293 N.W.2d 843 (1980). Restatement of Property § 404(1) (1944) defines a restraint on alienation as follows:

A restraint on alienation, as that phrase is used in this Restatement, is an attempt by an otherwise effective conveyance or contract to cause a later conveyance

(a) to be void: or

(b) to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey; or

(c) to terminate or subject to termination all or a part of the property interest conveyed.

The due-on-sale clause itself "does not prohibit transfer, and can not be enforced to prevent the transfer. The clause first requires consent to transfer, but the borrower is able to avoid that consent by paying the debt." Subcommittee Report, *supra*, note 12 at 898. This obstacle to finding a restraint was overcome by the court in *Nichols v. Ann Arbor Federal Savings & Loan Association*, 73 Mich.App. 163, 166–67, 250 N.W.2d 804, 806 (1977), as follows: "If the mortgage clause defendant seeks to enforce can be labeled a restraint on alienation only by expanding the restatement definition, we do not hesitate to stretch the term to include this 'due-on-sale' clause."

One writer notes that "the due-on-sale clause does not fit exactly within any of the established categories of direct restraints, disabling, forfeiture or promissory." Volkmer, *The Application of the Restraints in*

16. *E.g., Patton v. First Fed. Sav. & Loan Ass'n*, 118 Ariz. 473, 578 P.2d 152 (1978); *Nichols v. Ann Arbor Fed. Sav. & Loan Ass'n*, 73 Mich. App. 163, 250 N.W.2d 804 (1977). *Baltimore Life Ins. Co. v. Harn*, 15 Ariz.App. 78, 486 P.2d 190 (1971), relied on equity principles to invalidate a clause, as did *Mutual Fed. Sav. & Loan Ass'n v. American Medical Servs.*, 66 Wis.2d 210, 223 N.W.2d 921 (1974). *Contra, Mutual Fed. Sav. & Loan Ass'n v. Wis. Wire Works*, 71 Wis. 531, 239 N.W.2d 20 (1976).

*Alienation Doctrine to Real Property Security Interests,* 58 Iowa L.Rev. 747, 773 (1973). He concludes, however, that

> the due-on-sale clause is so closely akin to the promissory restraint as to justify designating it as a direct restraint. * * * Although written as an acceleration clause, the due-on-sale clause directly and fundamentally burdens a mortgagor's ability to alienate as surely and directly as the classical promissory restraint. As such, the due-on-sale clause is truly a direct restraint insofar as the category of direct restraints can be articulated.

*Id.* at 773–74. The author acknowledges the strained character of the argument but justifies classifying the due-on-sale clause as a direct restraint on alienation because it "appears preferable to creating a new body of law known as the 'indirect restraints doctrine.'" *Id.* at 774 n. 114.

We do not find the economic concerns which have motivated the courts to hold that a due-on-sale clause is a restraint on alienation unless it is exercised to protect the lender's security interest to be as compelling where the loan is used to finance investment residential property, even though the use of the due-on-sale clause to increase interest rates may restrict the transfer of both borrower-occupied residential property and investment residential property in the same manner. The need of the borrow-occupier for quick and easy transfer of personal residence is greater than that of the investment borrower. The tension between restraint on alienation principles and the freedom to contract strikes a different balance when the validity of the use of a due-on-sale clause to increase interest rates is questioned in a commercial setting, where economic considerations outweigh all others. This court views the transaction in an investment setting as one presumably less subject to overreaching, not because the borrower will in all cases be more sophisticated but because of the forces compelling the transaction.

■ The legislature, by enacting Minn.Stat. § 47.20, subd. 6, supra note 4, has determined, in effect, that the enforcement of due-on-sale clauses in the transfer of borrower-occupied residential property, as limited by the statute, is *per se* unreasonable except to protect against impairment of the lender's security interest. Accepting that determination, we hold that the enforcement of due-on-sale clauses in the transfer of investment residential property is not *per se* unreasonable. We will not prohibit the exercise of a mortgage contract due-on-sale clause when the contract concerns investment residential property and no inequities in the bargaining of the contract are proved. We will apply, in all due-on-sale cases, traditional rules of equity and law. Here, the contract was negotiated by experienced business people, and there are no allegations of improper conduct, fraud, duress, coercion, or overreaching. The due-on-sale clause contained in the mortgage agreement in this case does not constitute an unlawful restraint upon the alienation of the investment residential property at issue.

Reversed.