TORGERSON–FORSTROM H.I. OF
WILLMAR, INC., et al.,
Appellants,

v.

OLMSTED FEDERAL SAVINGS AND
LOAN ASSOCIATION, etc., et al.,
Respondents.

No. C2–82–814.

Supreme Court of Minnesota.

Nov. 10, 1983.

David L. Graven, Larry M. Wertheim,
Holmes & Graven Chartered, Minneapolis,
for appellants.

Stephen J. Beatty, William J. Utermoh-
len, Hessian, McKasy, & Soderberg, Minne-
apolis, for respondents.

COYNE, Justice.

This action for breach of contract and
tortious interference with contract arises
out of defendant savings and loan associa-
tions' refusal to consent to the plaintiff
mortgagor's sale of the mortgaged property
without an increase in the interest rate. At
issue is the extent to which a mortgagee's
agreement that "consent shall not be unrea-
sonably withheld" limits the enforceability
of a due-on-sale clause. Plaintiffs appeal
from the order of the Kandiyohi County
District Court for summary judgment in
favor of the defendants. We affirm.

Appellant Torgerson-Forstrom H.I. of
Willmar, Inc. (hereinafter Torgerson-For-
strom), is a Minnesota corporation which
owns and operates the Willmar Holiday Inn

(hereinafter the Inn). Both of its shareholders, Thomas Torgerson and C.R. Forstrom, are experienced in banking[1] and real estate financing. In 1972 Torgerson-Forstrom financed the construction of the Inn with a mortgage loan from IDS Mortgage Corporation. Subsequently, IDS assigned the mortgage to First Federal Savings and Loan Association of Willmar (First Willmar), First Federal Savings and Loan Association of Mankato (First Mankato), Owatonna Savings and Loan Association (Owatonna), Peoples Savings and Loan Association (Peoples), and Olmsted Federal Savings and Loan Association (Olmsted). The 1972 mortgage contained a due-on-sale clause, which provided that waiver of the right to declare the indebtedness immediately due "shall not be unreasonably withheld."

In 1975 Torgerson-Forstrom entered into a new mortgage with Conservative Mortgage Company (Conservative) in order to finance the construction of an addition to the Inn. Torgerson-Forstrom executed a promissory note, dated December 26, 1975, in the amount of $1,829,000 bearing interest at the rate of 9⅝% per annum. The note prohibits the prepayment of principal until February 1, 1983. Thereafter, prepayment is permitted on payment of a premium (initially 5% and decreasing annually) until February 1, 1993, when prepayment is permitted without penalty.

The note is secured by a mortgage, which contains the following provision entitled "restrictions on sale, conveyance, or alienation":

> The Mortgagor covenants and agrees not to sell, convey, transfer, encumber, or alienate said Premises, or any part thereof, or any interest therein in any manner or way, whether voluntary or involuntary, without the prior written consent of the Mortgagee. Consent by the Mortgagee as to one transaction or occurrence shall not be deemed to be a waiver of the right as to any subsequent transaction or occurrence. *The Mortgagee agrees consent shall not be unreasonably withheld.*

(Emphasis supplied). Breach of any covenant constitutes an "event of default", which entitles the mortgagee to accelerate the maturity and to foreclose the mortgage. Under the terms of the mortgage, any tender of payment following the acceleration of maturity must include the prepayment premium provided in the note.

On completion of the construction the new mortgage was assigned to the five assignees of the 1972 mortgage. Conservative continued to service the mortgage.

On September 22, 1979, Torgerson and Forstrom entered into an agreement with Quik-Stop Marshall, Inc. (Quik-Stop), a corporation owned by one Orvis Pattison, for the purchase of the shares of Torgerson-Forstrom and the subsequent liquidation of Torgerson-Forstrom into Quik-Stop. The purchase agreement, which set the price of the stock at $2,906,000, was contingent on the lenders' consent. The transaction was to close on November 15, 1979.

About the middle of October, 1979, Torgerson-Forstrom's broker delivered a proposed consent form to Conservative. On October 31st Conservative transmitted the proposed consent, together with the stock purchase agreement and Pattison's financial statement, to First Willmar. The other four lenders received their first notice of the proposed transaction on November 12th, three days before the closing date. First Willmar and Owatonna consented, but First Mankato, Peoples, and Olmsted agreed to consent provided that the interest rate be increased 2% to 11⅝%. When he was informed of the terms of First Mankato's, Peoples', and Olmsted's consent, Pattison declined to proceed with the transaction.

Asserting that the refusal to consent unconditionally prevented the sale of the Tor-

---

[1] Both have been shareholders and directors of banks, and Forstrom has been the managing officer and president of a bank.

gerson-Forstrom shares, Torgerson-Forstrom sued the non-consenting lenders alleging breach of contract and tortious interference with contract. The defendant lenders moved for summary judgment, conceding for that purpose that Quik-Stop was "completely creditworthy" and that their refusal to consent unconditionally caused the termination of the purchase agreement. When the district court ruled that the only fact issue presented was the reasonableness of the proposed increase in the interest rate, Torgerson-Forstrom conceded that the market rate on November 15, 1979, for similar loans was 11⅝% or more and that the rate requested was reasonable. Thus, the sole issue on appeal is whether the defendants "unreasonably" withheld their consent to the proposed transfer of ownership by conditioning their consent on an increased interest rate. Although "reasonableness" is almost always an issue reserved for the finder of fact, we hold that it was not unreasonable for the mortgagees to condition their consent to the sale involving the mortgaged property, pursuant to provisions of a due-on-sale clause, on an increase, conceded to be reasonable, in the interest rate on the loan secured by the property.[2]

Much has been written about the consent-to-transfer or due-on-sale clause[3] during the last decade or so since the escalation of interest rates spurred lenders to resort to the due-on-sale clause to protect their position in the money market, prompting borrowers to litigate and governments to regulate. Suffice it to say here that in *Holiday Acres No. 3 v. Midwest Federal Savings and Loan Association of Minneapolis,* 308 N.W.2d 471 (Minn.1981), this court held that the enforcement of a due-on-sale clause by a mortgagee, which declined to waive its right to accelerate payment of the loan and required the purchaser to refinance at a higher rate of interest, was not per se unreasonable even though the clause was no doubt originally inserted to insure against impairment of the security.

Torgerson-Forstrom concedes that due-on-sale clauses in mortgages secured by investment property are generally enforceable in Minnesota but contends that the inclusion of the mortgagee's agreement that consent shall not be unreasonably withheld precludes the lender from withholding its consent for any reason other than the impairment of the lender's security. The wording, however, of the lender's agreement—that "consent shall not be unreasonably withheld"—is singularly inapt to express a contractual intention that the withholding of consent is unreasonable save under one particular circumstance, that is, where the sale threatens to impair the security of the debt. In support of its contention that the inclusion of the words "consent will not be unreasonably withheld" eliminates all but one basis for refusing to consent, Torgerson-Forstrom commends as analogous cases in which it has been held that a lessor may not condition his consent to assignment of the leasehold on a rent increase. *Ringwood Associates, Ltd. v. Jack's of Route 23, Inc.,* 153 N.J.Super. 294, 379 A.2d 508 (1977); *Chanslor-Western Oil and Development Co. v. Metropolitan Sanitary District of Greater Chicago,* 131 Ill. App.2d 527, 266 N.E.2d 405 (1970). We are not persuaded, however, that these cases compel, or even permit, the conclusion that the phrase "consent will not be unreasonably withheld" narrows either the purpose or the scope of the leasehold anti-assignment clause.

 The rationale for the rule that absent an agreement that consent will not be unreasonably withheld, the lessor may arbi-

---

**2.** It is not disputed that the determination whether or not the language of a contract is ambiguous and the construction and effect of an unambiguous contract are questions of law. *See, e.g., Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63 (Minn.1979); *Leslie v. Minneap-* *olis Teachers Retirement Fund Ass'n,* 218 Minn. 369, 16 N.W.2d 313 (1944).

**3.** Although the consent-to-transfer clause in question is atypical, the parties and the court below refer to and treat this provision as a due-on-sale clause.

trarily refuse to accept a subtenant suitable and otherwise responsible is that since the lessor has exercised a personal choice in the selection of a tenant who will occupy the lessor's property for a definite term and has expressly provided that no substitute shall be acceptable without his consent, no obligation rests on the lessor to look to anyone but the tenant for performance of the lease. *Gruman v. Investors Diversified Services,* 247 Minn. 502, 78 N.W.2d 377 (1956). In other words, the purpose of an anti-assignment clause in a lease is to assure the suitability of the tenant for the protection of the landlord in his ownership and operation of his property—not for his general economic protection—regardless whether or not the clause provides that consent will not be unreasonably withheld. Although the dominant purpose of a mortgage deed is, of course, that of securing the mortgagor's debt, the terms incorporated in the mortgage can, and do, serve other purposes than debt security. The dual purpose of the due-on-sale clause—the protection of the lender's security interest in the mortgaged property and his position in the money market—is well recognized. In neither the mortgage due-on-sale clause nor the leasehold anti-assignment clause does the inclusion of the requirement that consent not be unreasonably withheld change the purpose for which the clause was inserted. The language of the "due-on-sale" clause in question is broad but unambiguous. There can hardly be any doubt of its intended meaning. The parties expressly provided, and therefore intended, that the borrower secure the consent of the lender before selling or transferring the mortgaged property, or any part of or interest in the property, and that the lender should have the right to withhold consent on *any* basis that is not unreasonable. *Crestview, Ltd. v. Foremost Insurance Co.,* Tex.Civ.App., 621 S.W.2d 816 (1981). But *see Silver v. Rochester Savings Bank,* 73 A.D.2d 81, 424 N.Y.S.2d 945 (1980) (parties did not intend to permit mortgagee, which held leasehold interest in mortgaged premises with fixed-price option to pur-

chase, to increase the interest rate on a sale of the property); *Iris v. Marine Midland Bank of Southeastern New York,* 114 Misc.2d 251, 450 N.Y.S.2d 997 (1982); *Fogel v. S.S.R. Realty Associates,* 183 N.J.Super. 303, 443 A.2d 1093 (1981).

■ Torgerson-Forstrom contends that when the mortgage was executed its president, Torgerson, was assured that the sole purpose of the clause was to permit the lender to investigate the creditworthiness of the prospective buyer and to disapprove a financially unsatisfactory buyer. The mortgagee contends that the comment also referred to the lender's right to consider market factors such as interest rates. Evidence of a contemporaneous parol promise may not be considered to vary or add to contract terms clearly expressed. *Hayle Floor Covering, Inc. v. First Minnesota Construction Co.,* 253 N.W.2d 809 (Minn.1977); *Stith v. Hudson City Savings Institution,* 63 Misc.2d 863, 313 N.Y.S.2d 804 (1970); *Shalit v. Investors Savings and Loan Association,* 101 N.J.Super. 283, 244 A.2d 151 (1968). Neither fraud nor misrepresentation is alleged. The proffered evidence would not serve to assist the interpretation of debatable language. Rather, it would import into the due-on-sale clause a limitation alien to its express written terms.

■ That the protection of the lender's position in the money market is a legitimate and proper reason for the enforcement of a due-on-sale clause has been recognized by the Federal Home Loan Bank Board, 41 Fed.Reg. 6283, 6285 (1976), which promulgated regulations permitting federal savings and loan associations to include and enforce due-on-sale provisions according to their terms. 12 CFR § 545.8–3(f) (1982). Those regulations preempt conflicting state limitations on the due-on-sale practices of federal savings and loan associations. *Fidelity Federal Savings and Loan Association v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). The Garn-St. Germain Depository Institutions

Act of 1982 preempts state due-on-sale restrictions applicable to lenders other than federal savings and loan associations. Pub.L. No. 97–320, § 341, 96 Stat. 1505 (1982). Of course, we have previously acknowledged in *Holiday Acres, supra,* that the protection of the lender's position in the money market is one of the purposes served by the due-on-sale clause, and we have now determined that that purpose is unaffected by the express requirement that the lender's consent to the transaction not be unreasonably withheld. Furthermore, we also held in *Holiday Acres* that it was not unreasonable per se for a mortgagee to condition its waiver of the right to accelerate the loan on an increase in the interest rate. The only question remaining, then, is the reasonableness of the terms on which the defendant lenders conditioned their consent. Torgerson-Forstrom has, however, conceded that the increased interest rate proposed by the lenders is reasonable. Since there are no disputed issues of material fact, the trial court properly ordered summary judgment for the defendant lenders.

Affirmed.